# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

———————————————————————
)
SHOALS TECHNOLOGIES GROUP, LLC,  )
)
          Plaintiff,  )
)     Case No. 1:25-cv-026-WO
          v.  )
)
VOLTAGE, LLC AND NINGBO VOLTAGE  )
SMART PRODUCTION CO.,  )
)
          Defendants.  )
———————————————————————)


## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S THIRD AMENDED COMPLAINT

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ............................................................................ 1

II.   ARGUMENT ................................................................................................... 3

      A.    Shoals Fails to Identify the Alleged "Confidential Business Information" that
            Voltage Allegedly Used to Develop "Alternative Designs" ......................... 4

      B.    Shoals Fails to Allege a Plausible Violation of the ITC Protective Order .... 7

      C.    Shoals Fails to Allege Standing under the UDTPA .................................... 11

      D.    Even if Shoals Has Alleged a Viable Claim, the Court Should Dismiss or
            Stay the Claims in Deference to the ITC's Primary Jurisdiction ............... 13

      E.    Shoals' Claims Targeting "Alternative Designs" Should Be Dismissed for
            Failure to Allege an Infringing Act and Under Patent Preemption Principles
            ............................................................................................................. 19

III.  CONCLUSION ............................................................................................. 21

i

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Action N.C. v. Strach*,
    216 F. Supp. 3d 597 (M.D.N.C. 2016) ........................................................................ 8

*Alberta Gas Chems., Ltd. v. Celanese Corp.*,
    650 F.2d 9 (2d Cir. 1981)........................................................................................... 17

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................ 7, 10, 11

*Champion Pro Consulting Grp., Inc. v. Impact Sports Football, LLC*,
    845 F.3d 104 (4th Cir. 2016) ................................................................................ 13, 17

*Convatec, Inc. v. HR Pharms., Inc.*,
    No. 24-cv-1248, 2025 WL 1859228 (D. Del. June 10, 2025) ..................................... 19

*Design Gaps, Inc. v. Hall*,
    No. 3:23-cv-186, 2023 WL 8103156 (W.D.N.C. Nov. 21, 2023) ................................. 4

*In the Matter of Certain Human Milk Oligosaccharides*,
    Comm'n Opinion, No. 337-TA-1120, 2020 WL 3073788 (June 8, 2020) ................ 2, 9

*Kenney Props., Inc. v. Phila. Indem. Ins. Co.*,
    665 F. Supp. 3d 752 (E.D.N.C. 2022)................................................................... 3, 11

*Madison Oslin, Inc. v. Interstate Res., Inc.*,
    No. 12-cv-3041, 2015 WL 1402268 (D. Md. Mar. 25, 2015) ...................................... 6

*Meditech Int'l Co. v. Minigrip, Inc.*,
    648 F. Supp. 1488 (N.D. Ill. 1986) ........................................................................... 18

*Mountaineer Motors of Lenoir, LLC v. Carvana, LLC*,
    No. 5:22-cv-171, 2023 WL 6931787 (W.D.N.C. Oct. 19, 2023) ................................. 3

*Movement Mortg., LLC v. McDonald*,
    No. 3:17-cv-716, 2018 WL 6733953 (W.D.N.C. Nov. 6, 2018) ................................... 4

*Precision Links Inc. v. USA Prods. Grp.*,
    2009 WL 801781 (W.D.N.C. Mar. 25, 2009)............................................................. 12

*Rahamankhan Tobacco Enters. PVT. Ltd. v. Evans Mactavish Agricraft, Inc.*,
    989 F. Supp. 2d 471 (E.D.N.C. 2013)........................................................................ 13

*Reiter v. Cooper*,
    507 U.S. 258 (1993)................................................................................................ 14

*Skinner v. E. F. Hutton & Co.*,
    314 N.C. 267, 333 S.E.2d 236 (1985).................................................................... 14

*Southern States Imports, Inc. v. Subaru of Am., Inc.*,
    No. 5:05-cv-752, 2008 WL 2234625 (E.D.N.C. May 30, 2008)............................. 12

*Sysco Mach. Corp. v. DCS USA Corp.*,
    No. 5:23-cv-134, 2023 WL 7752051 (E.D.N.C. Nov. 15, 2023) ........................ 4, 5

*Terracino v. Trimaco, Inc.*,
    No. 5:22-cv-015, 2023 WL 2656753 (E.D.N.C. Mar. 27, 2023).............................. 6

*U.S. v. Western Pac. R. Co.*,
    352 U.S. 59 (1956).................................................................................................. 14

*VisionAIR, Inc. v. James*,
    167 N.C. App. 504, 606 S.E.2d 359 (2004)............................................................. 4

*Wimer & Assocs., P.C. v. Thiel*,
    No. 1:14-cv-168, 2015 WL 773401 (W.D.N.C. Feb. 24, 2015), *aff'd*, 627 F. App'x
    272 (4th Cir. 2016).................................................................................................... 8

## FEDERAL STATUTES

35 U.S.C. § 271(a) .......................................................................................................... 19

## FEDERAL RULES

Fed. R. Civ. P. 11............................................................................................................. 5

Fed. R. Civ. P. 12(b)(6) .................................................................................................. 6

Fed. R. Civ. P. 37(b)...................................................................................................... 16

## FEDERAL REGULATIONS

19 CFR § 210.......................................................................................................... *passim*

iii

Defendants Voltage, LLC and Ningbo Voltage Smart Production Co. (together, "Voltage"), through counsel, respectfully submit this Memorandum of Law in Support of their Motion to Dismiss the Third and Fourth Claims for Relief in Plaintiff Shoals Technologies Group LLC's ("Shoals") Third Amended Complaint (TAC). Additionally, Voltage moves to dismiss the First, Second, and Fifth Claims for Relief to the extent they are based on alleged patent infringement of the newly alleged "alternative designs."

## I. PRELIMINARY STATEMENT

Shoals' new state law tort claims—vaguely alleging Voltage used "confidential business information" (CBI) to develop "alternative designs"—fail to state a claim and should be dismissed. Shoals' vague allegations fail to satisfy even basic notice pleading as to the CBI and alternative designs at issue, and fail to allege any facts to support a plausible claim that Voltage "used" the CBI in violation of the ITC protective order. The Court was correct to identify this deficiency at the recent status conference: "Well, the unfair competition claim is largely conclusory. I mean, there are no facts pled there to say exactly what it was that [Voltage] took from the ITC discovery . . . . Nothing, zero, zip. It's just conclusory." *See* Oct. 9, 2025 Status Conf. Tr. at 15:17–22.

For the alleged CBI at issue, Shoals sweepingly and vaguely claims that it includes "certain materials related to the Shoals BLA," which may be, "but [is] not limited to," a list of possible categories. TAC ¶ 42. Further, Shoals alleges "on information and belief" that Voltage "used" the unidentified CBI in some unexplained manner to develop unidentified "alternative designs," which Voltage submitted to the ITC pursuant to the

1

*Human Milk* "redesign" adjudication procedure.[1] Shoals does not identify the "alternative designs" in its TAC. Shoals does not explain how Voltage "used" any part of any CBI for any part of any alternative design. And Shoals does not otherwise explain what alleged facts support its "information and belief" that Voltage violated the ITC protective order.

Even more bizarre and confusing, Shoals' injury theory is the classic "heads I win, tails you lose." On the one hand, Shoals alleges the injury is that the ITC might find the alternative designs as non-infringing, and if so, they would "avoid restrictions" imposed by the ITC and unfairly "compete in the marketplace." *See* TAC ¶ 48. But, on the other hand, Shoals alleges injury because the CBI enabled Voltage's "alternative designs" to "further infringe [the Asserted Patents]." *See* TAC ¶ 46. While neither of these theories are supported (or logical), the Court need not sift through these contradictory allegations because Shoals has not alleged a cognizable "injury" under the UDTPA. Shoals has not alleged that Voltage has sold, marketed, or otherwise engaged in any commercial activity for the so-called "alternative designs." And Shoals' counsel candidly admitted at the status conference that Shoals has no basis to allege commercial activities.[2]

---

[1] *See In the Matter of Certain Human Milk Oligosaccharides*, Comm'n Opinion, No. 337-TA-1120, 2020 WL 3073788, *11 (June 8, 2020) (hereafter, "***Human Milk***") (describing ITC's "policy in favor of adjudicating redesigns to prevent subsequent and potentially burdensome proceedings that could have been resolved in the first instance in the original Commission investigation").

[2] *See* Sept. 10, 2025 Status Conf. Tr. at 15:17–22 ("I would say that based on our current understanding, it's not clear whether Voltage has commercialized these alternate designs or whether they're just theoretically. . . . If they're noncommercial and it's just a theoretical litigation construct, then there wouldn't be any activity that could be subject to an infringement claim.").

2

Lastly, the Court should consider whether Shoals' claims—rooted in conduct before the ITC, implicating ITC regulations and orders, and partially contingent on forthcoming rulings from the ITC—should be dismissed or stayed in deference to the ITC's primary jurisdiction. Shoals has not explained why it did not (and has not) raised the alleged "intentional, willful, and wanton" protective order violation directly with the ITC. In fairness to agency–judicial comity, these issues should be raised and adjudicated in the first instance before the agency that issued the relevant order and regulations and oversaw the very proceedings in which Shoals alleges the violation occurred.

## II.    ARGUMENT

The North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") declares unlawful "unfair or deceptive acts or practices in or affecting commerce," N.C. Gen. Stat. § 75-1.1, and provides a private right of action for anyone "injured by reason of" an unfair or deceptive trade practice. N.C. Gen. Stat. § 75-16. Thus, "to establish a prima facie claim for unfair trade practices, a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Kenney Props., Inc. v. Phila. Indem. Ins. Co.*, 665 F. Supp. 3d 752, 765 (E.D.N.C. 2022) (quoting *SciGrip, Inc. v. Osae*, 373 N.C. 409, 426, 838 S.E.2d 334, 347 (2020)).[3]

---

[3] Where a UDTPA claim and unfair competition claim are based on the same facts, because the claims are "not appreciably different," courts generally analyze them together under the UDTPA analysis. *Mountaineer Motors of Lenoir, LLC v. Carvana, LLC*, No. 5:22-cv-171, 2023 WL 6931787, at *6 n.5 (W.D.N.C. Oct. 19, 2023) ("Because a common law

## A. Shoals Fails to Identify the Alleged "Confidential Business Information" that Voltage Allegedly Used to Develop "Alternative Designs"

A claim for misuse of "confidential information"—whether asserted as a claim for trade secret misappropriation, breach of confidentiality, or otherwise—must identify the alleged information with sufficient specificity to enable the defendant to delineate what he has been accused of misusing. *See Sysco Mach. Corp. v. DCS USA Corp.*, No. 5:23-cv-134, 2023 WL 7752051, at *2 (E.D.N.C. Nov. 15, 2023) (plaintiff must allege "sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating"); *Design Gaps, Inc. v. Hall*, No. 3:23-cv-186, 2023 WL 8103156, at *9 (W.D.N.C. Nov. 21, 2023) (plaintiff must allege "sufficient detail to put Defendants on notice as to the precise information at issue").[4] While this basic notice-pleading requirement is most commonly raised in trade secret cases, it applies to any claim of misuse of alleged "confidential information." *See, e.g.*, *VisionAIR, Inc. v. James*, 167 N.C. App. 504, 510, 606 S.E.2d 359, 363 (2004) (claim for breach of NDA: "[Plaintiff] neither alleged facts supporting the alleged breach, nor specified [the] confidential information").

---

claim for unfair competition and a UDTPA claim are 'not appreciably different,' the Court considers them in the same analysis.") (collecting cases).

[4] Relying on trade secret identification case law by analogy makes sense for UDTPA claims because UDTPA claims premised on trade secret allegations generally rise or fall on the merits of the trade secret claim. *Compare Movement Mortg., LLC v. McDonald*, No. 3:17-cv-716, 2018 WL 6733953, at *8 (W.D.N.C. Nov. 6, 2018) (UDTPA claims survives dismissal because trade secret claim survives dismissal), *with Sysco Mach. Corp.*, 2023 WL 7752051, at *4 (failed misappropriation claim warrants dismissal of UDTPA claim based on same facts).

Shoals provides no meaningful identification of what CBI is at issue, ostensibly reserving its ability to claim any and all CBI materials produced in the ITC case.[5] For example, Shoals begins by vaguely alleging the misused CBI is "***certain materials***" that are "related to the Shoals BLA." TAC ¶ 42 (emphasis added); *id*. ¶ 44 ("***certain*** Confidential Business Information") (emphasis added). Shoals then alleges the "certain materials" may include, "***but [are] not limited to***," a broad and vague list of possible categories: "physical samples, schematic drawings, manufacturing documentation, and testing reports." TAC ¶ 42 (emphasis added). These sweeping allegations do not "enable [Voltage] to delineate that which [it is] accused of misappropriating," *Sysco*, 2023 WL 7752051, at *2, as the Court rightly observed at the recent status conference. *See* Oct. 9, 2025 Status Conf. Tr. at 15:17–22 ("Well, the unfair competition claim is largely conclusory. I mean, there are no facts pled there to say exactly what it was that [Voltage] took from the ITC discovery . . . . Nothing, zero, zip. It's just conclusory.").

Two additional factors make Shoals' vague allegations particularly egregious. First, this is not a situation where the plaintiff is somehow at a disadvantage in identifying what was misused, such as where there has been an unlawful IT intrusion and the plaintiff does not yet know what was allegedly taken. Shoals' claim is based on ***specific*** ("certain") documents that Shoals itself produced in the ITC proceedings. *See* TAC ¶ 42 ("certain materials"), ¶ 44 ("certain [CBI]"). Shoals purports to have a Rule 11 basis to claim that

---

[5] For context, Shoals produced nearly 18,000 documents designated as CBI in the ITC proceedings, comprising nearly 70,000 pages of CBI materials.

the "alternative designs" are based on information derived from its own CBI materials. *See* TAC ¶ 74 ("which they could have never formulated without the nefarious use of Shoals's [CBI]"). What CBI was so critical that the alternative designs "could have never [been] formulated without"? Shoals does not say. If Shoals actually has a credible claim that Voltage misused its CBI to formulate its alternative designs, there would be no need for vague, equivocal, and catch-all language. Nor should such conclusory language satisfy Shoals' pleading requirements.

Second, Shoals' own allegations suggest that any alleged CBI is almost certainly disclosed in Shoals' own patents, which, by definition, necessarily means the information is public knowledge and thus not "confidential." *See Terracino v. Trimaco, Inc.*, No. 5:22-cv-015, 2023 WL 2656753, at *7 (E.D.N.C. Mar. 27, 2023) (publication in a public patent destroys the secrecy of confidential information). Indeed, when a plaintiff alleges misuse of alleged confidential information relating to the plaintiff's own patented technology, the plaintiff must allege the information with sufficient specificity to rebut the more likely inference that the information is disclosed in the patents along with the rest of the invention. *See id*. at *7 (finding on Rule 12(b)(6) that "all the information allegedly misappropriated [] is disclosed in the '917 patent"). This makes sense because the whole point of a patent is to describe the invention sufficiently to "enable someone skilled in the art to duplicate it." *Madison Oslin, Inc. v. Interstate Res., Inc.*, No. 12-cv-3041, 2015 WL 1402268, at *4 (D. Md. Mar. 25, 2015) ("the contents of the patent are public knowledge and cannot constitute trade secrets"). Here, Shoals alleges the CBI "relate[s] to the Shoals BLA" (TAC

6

¶ 42), the Shoals' BLA "is protected by the Asserted Patents" (*id.* ¶ 20), and the CBI enabled Voltage to "further infringe" the Asserted Patents. *Id.* ¶ 46. Yet Shoals fails to identify the CBI at all, let alone sufficiently to offset the inference (created by Shoals' own allegations) that the Asserted Patents likely disclose anything Voltage could have used from the CBI to "***further infringe***" the Asserted Patents.[6]

### B.  Shoals Fails to Allege a Plausible Violation of the ITC Protective Order

Shoals' failure to identify the CBI at issue necessarily means Shoals has not alleged plausible facts to support a claim that Voltage violated the ITC protective order. Even aside from this deficiency, Shoals' claim fails for several additional reasons. To recap, the only non-conclusory facts Shoals alleges in support of its claim are: (1) Shoals produced some unidentified CBI to Voltage in the ITC proceedings and (2) Voltage developed some unidentified "alternative designs" to be adjudicated as part of the ITC proceedings. These facts do not support a plausible claim that Voltage violated the ITC protective order. And Shoals' conclusory allegation "on information and belief" that Voltage "used" CBI does nothing to "nudge" the claim "across the line from conceivable to plausible." *See Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009).

To start, Shoals does not even address any specific language or provision of the ITC protective order, nor does Shoals explain how Voltage allegedly violated it. Critically, this

---

[6] For example, even the vague categories of information Shoals identifies in the catch-all "including but not limited to" paragraph appear in the Asserted Patents. *E.g., compare* TAC ¶ 42 ("schematic drawings"), *with* TAC, Ex. 1 at 32 ("FIG. 4 schematically represents a system of the present invention").

7

is not a situation in which the mere possession the information is the basis for the claim. Indeed, the ITC protective order specifically permits Voltage's outside counsel to access CBI, *see* TAC, Ex. 14, ECF 74-5 § 3 ("outside counsel for parties to this investigation"), with the caveat that the information "not [be] reveal[ed] . . . to anyone other than another person designated." *Id*. Moreover, the protective order allows outside counsel to "utilize such [CBI] solely for purposes of [the] investigation." *Id*. § 4. Shoals does not allege that Voltage's outside counsel revealed any CBI to Voltage, nor does Shoals allege that Voltage's outside counsel used any CBI for a purpose other than the ITC proceedings.

Shoals' only allegation of "use" is a vague allegation and conclusory "on information and belief" that "Defendants used Shoals's [CBI] to create purported 'alternative designs.'" TAC ¶ 45. But allegations "on information and belief" are only accepted "where the belief is based on factual information that makes the inference of culpability plausible." *Action N.C. v. Strach*, 216 F. Supp. 3d 597, 618 (M.D.N.C. 2016). Without this necessary "factual enhancement" pushing the claim from "possible" to "plausible," conclusory allegations on "information and belief" are appropriately disregarded. *Wimer & Assocs., P.C. v. Thiel*, No. 1:14-cv-168, 2015 WL 773401, at *4, n.4 (W.D.N.C. Feb. 24, 2015), *aff'd*, 627 F. App'x 272 (4th Cir. 2016) ("['on information and belief'] is a lawyer shorthand expression of uncertainty, and implies that the Plaintiff has no factual basis underlying the conclusory allegations to put before the Court").

Here, the only facts supporting Shoals' claim of "use" is that Voltage developed "alternative designs" as part of the ITC proceedings to "avoid restrictions" that may be

8

ordered by the ITC. *See* TAC 45, 48. But none of these facts suggest any inference of culpable conduct (let alone a protective order violation) because these facts are present in nearly every ITC case: the complainant initiates an ITC case; the ITC issues a protective order permitting counsel's access to CBI; the parties produce discovery with CBI designations; and respondents submit alternative designs or "redesigns"—often developed during the ITC case—for an infringement determination along with accused products. *See Human Milk*, 2020 WL 3073788, *11 (describing ITC's "policy in favor of adjudicating redesigns to prevent subsequent and potentially burdensome proceedings that could have been resolved in the first instance in the original Commission investigation").[7]

If these facts alone—*i.e.*, counsel's proper access to CBI under the protective order and respondents' development of a redesign under *Human Milk*—somehow support a plausible inference of a protective order "use" violation, then ***every ITC case*** involving a redesign necessarily gives rise to a follow-on district court claim for unfair competition. Since the ITC's decision in *Human Milk*, the utilization of the redesign procedure has grown drastically.[8] Shoals' claims are plainly not what the ITC intended when it developed

---

[7] Katherine D. Cappaert, *ITC Section 337 Investigations: 2023 Highlights and Horizon Issues*, WESTLAW: PRACTICAL LAW (Jan. 3, 2024) ("[R]espondents often request that the ALJ adjudicate non-accused products during the investigation," including "redesigns . . . fast-tracked by the respondent during the investigation.") (available at https://next.westlaw.com/Document/Ic16d6c73728311ee8921fbef1a541940/View/FullText.html ).

[8] Maggie Dowling and Daniel Muino, *Has Human Milk Expired? – Current Application of the Redesign Standard in Original 337 Investigations*, MORRISON FOERSTER (May 21, 2024) ("In the year following the *Human Milk* investigation, the [redesign adjudication] average 'increased by 100% to about six or seven per year' with approximately eight investigations having such disputed motions against redesign products. Since 2021, the

its standard ITC protective order and policy favoring adjudication of redesigns. The ITC did not create a legal framework that—if utilized—necessarily results in an inference of misconduct and claims of unfair competition.

Not only is Shoals' claim lacking in requisite plausibility, but it is affirmatively implausible. The objective of developing a redesign under *Human Milk* is to design *around* the patent claims to obtain a finding of noninfringement for the redesigned product. Yet, Shoals' claim is premised on the nonsensical theory that Voltage engaged in a redesign process by looking to Shoals' CBI (and not, *e.g.,* the patent claims that Shoals asserts for infringement) and that Voltage redesigned its products to more closely resemble Shoals' BLA product (allegedly to "further infringe" the Asserted Patents, rather than to present non-infringing alternatives). This makes no sense—practically or strategically.

The "obvious alternative explanation" (*Iqbal*, 556 U.S. at 682)—particularly in view of Shoals' failure to allege any non-conclusory facts suggesting impropriety—is that Voltage engaged in a standard redesign process under *Human Milk* to create alternative designs with features that do not meet one or more claim limitations to avoid infringing the Asserted Patents. Voltage did so based on Shoals' allegations that Voltage's product infringes the Asserted Patents (not based on Shoals' CBI). Now, Shoals alleges that the "alternative designs" still infringe the Asserted Patents, but also allege that its CBI was "nefarious[ly] use[d]" to "avoid" infringement. This is "heads I win, tails you lose."

---

trend has continued with approximately sixteen investigations involving disputed motions against redesigned products (as of the original publication of this article).") (available at www.mofo.com/resources/insights/240521-has-human-milk-expired-current#_ftn18).

Shoals cannot have it both ways, and its attempt to do so through vague, contradictory allegations, demonstrates why its claim fails under basic principles of plausibility. The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. Pleading facts that are "are 'merely consistent with' a defendant's liability," as Shoals has done here, "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*

To be sure, Voltage is not suggesting a tort claim can never be premised on protective order violation. But where, as here, Shoals has alleged nothing more than ordinary operation of ITC procedure, coupled with conclusory and contradictory "information and belief" allegations, these facts alone cannot state a plausible claim for relief. Shoals either has plausible facts (but failed to allege them) or has no grounds to assert a protective order violation. Regardless, the claims, as alleged, should be dismissed.

### C. Shoals Fails to Allege Standing under the UDTPA

Even if Shoals can allege an unfair or deceptive trade practice through a cognizable violation of the ITC protective order—which has not been alleged—Shoals has not plausibly alleged how development of the "alternative designs" for ITC adjudication under *Human Milk* constitute acts "in commerce," let alone how that those acts "proximately caused injury to [Shoals]." *Kenney Props.*, 665 F. Supp. 3d at 765.

Shoals acknowledged why during the status conference: merely presenting a redesign to the ITC does not infer anything beyond a "theoretical [] construct," and therefore Shoals has no basis to allege any "commercial" activities. *See* Oct. 9, 2025 Status

11

Conf. Tr. at 44:4–13 ("I would say that based on our current understanding, it's not clear whether Voltage has commercialized these alternate designs or whether they're just theoretically. . . . If they're noncommercial and it's just a theoretical litigation construct, then there wouldn't be any activity that could be subject to an infringement claim."). Nevertheless, Shoals alleges, "on information and belief," that Voltage has "or intend[s] to take to market these purported 'alternative designs,'" purportedly based on Voltage's future desire to "avoid restrictions" instituted by the ITC. TAC ¶¶ 47, 48.

But these facts are contingent on events that have not yet occurred and may never occur. For example, if the ITC finds no violation by Voltage's accused products, then there may be no need to "take to market" any alternative designs. There would be no "restrictions" to "avoid." Indeed, "speculative contention[s] do[] not suffice to establish proximate cause of injury" for the UDTPA. *See Southern States Imports, Inc. v. Subaru of Am., Inc.*, No. 5:05-cv-752, 2008 WL 2234625, at *10 (E.D.N.C. May 30, 2008). For example, in *Precision Links Inc. v. USA Prods. Grp., Inc.*, the plaintiff sued for patent infringement and, separately, under the UDTPA, on the grounds that the defendants' accused product could malfunction, which in turn could result in mistaken product identity with the plaintiff's product, potentially resulting in product liability litigation and brand tarnishment for plaintiff. *See* No. 3:08-cv-576, 2009 WL 801781, at *3 (W.D.N.C. Mar. 25, 2009). The court found that the allegations in the complaint, "that *if* the accused product malfunctions, the Plaintiff's goodwill will be tarnished and the Plaintiff *may* be exposed to product liability litigation" were "speculative allegations of possible harm in the future"

and were "insufficient to establish the actual injury necessary to support a claim under the UDTPA." *Id.* The same is true here. Shoals' fears that Voltage will "unfairly compete" by switching to an "alternative design" is based on speculative events that have not occurred.

Lastly, even if Shoals' conclusory "on information and belief" allegation that Voltage has "or intend[s] to take to market" the redesigned products, Shoals has still failed to allege any "damages," which is a necessary element for a UDTPA claim. *See Rahamankhan Tobacco Enters. PVT. Ltd. v. Evans Mactavish Agricraft, Inc.*, 989 F. Supp. 2d 471, 478 (E.D.N.C. 2013) ("A claimant must allege actual damages in claims for . . . violations of the UDTPA. The damages must proximately flow from the fraud or unfair and deceptive acts.") (citations omitted). Merely speculating that Voltage may "take to market" the redesigned products is insufficient to show cognizable, actual damages sufficient to support a UDTPA claim.

### D. Even if Shoals Has Alleged a Viable Claim, the Court Should Dismiss or Stay the Claims in Deference to the ITC's Primary Jurisdiction

Two doctrines—one state and one federal—should cause the Court to consider whether to defer to the ITC's primary authority over the question of whether Voltage violated the ITC protective order during the ITC-specific *Human Milk* redesign process.

First, under state law, "North Carolina courts have refused to apply the UDTPA to . . . matters already under 'pervasive and intricate regulation' by other statutory schemes that contain separate enforcement, supervisory, and remedial provisions.'" *Champion Pro Consulting Grp., Inc. v. Impact Sports Football, LLC*, 845 F.3d 104, 110 (4th Cir. 2016) (quoting *Hagy v. Advance Auto Parts, Inc.*, No. 3:15-cv-509, 2016 WL 5661530, at *2

13

(W.D.N.C. Sept. 28, 2016)). To that end, courts recognize the impropriety of imposing UDTPA liability "where there already exists an extensive regulatory regime to address the violations" and allowing the parallel UDTPA "remedy under those circumstances would improperly create overlapping supervision, enforcement, and liability." *Id*. (quoting *Hagey*, 2016 WL 5661530, at *2); *see also Skinner v. E. F. Hutton & Co.*, 314 N.C. 267, 274, 333 S.E.2d 236, 241 (1985) (UDTPA claim "would expose a party violating the statute to a host of legislatively created sanctions in addition to those sought in the private action").

Second, under federal law, the doctrine of primary jurisdiction applies "to claims properly cognizable in court that contain some issue within the special competence of an administrative agency." *Reiter v. Cooper*, 507 U.S. 258, 268 (1993). "[The doctrine] requires the court to enable a 'referral' to the agency, staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling." *Id*. The primary jurisdiction doctrine applies "even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined." *U.S. v. Western Pac. R. Co.*, 352 U.S. 59, 64 (1956).

Both doctrines apply to Shoals' tort claims. Shoals' claims are rooted in allegations that Voltage violated the ITC protective order during the ITC proceedings by using Shoals' CBI to develop a redesign submitted for *Human Milk* adjudication; and that now, due to this alleged misconduct, there is a risk the ITC's future merits ruling may allow the "'alternative designs' to avoid restrictions" if the ITC finds they do not infringe the Asserted Patents. TAC ¶ 48.

14

Critically, there is a robust regulatory framework for raising to the ITC conduct violating the protective order and a means to obtain appropriate relief for the violation. ITC regulations govern the definition of CBI, *see* 19 CFR § 210.5(a) ("definition" of "confidential business information"), restrictions on use of CBI, *id.* § 210.5(b) ("Restrictions on disclosure"), and CBI-related determinations during ITC proceeding. *Id.* § 210.5(e) ("Confidentiality determinations in investigations and other related proceedings"). This regulatory framework establishes the ITC's primary authority over CBI-related determinations, which includes initial decisions by the administrative law judge (ALJ),[9] and with appeals to the Commission.[10] The regulations also provide the ALJ's authority to issue "protective order[s]" like the standard ITC protective order at issue in this case. *See* 19 CFR § 210.34(a). Indeed, the protective order itself reiterates that the ALJ is responsible for addressing CBI designation issues (TAC Ex. 14 at ¶ 10), including holding a "hearing" on issues, including whether CBI is improperly designated because it is "publicly known" (such as through a published patent). *Id.* ¶ 7.

The regulations also provide a robust framework for addressing "[v]iolation[s] of protective order[s]." 19 CFR § 210.34(c). The regulations provide that "[i]f the breach

---

[9] 19 CFR § 210.5(e)(1) ("the [ALJ] shall set the ground rules for the designation, submission, and handling of information designated confidential by the submitter"); *id.* ("the [ALJ] shall decide whether information in a document . . . to be exchanged among the parties while the [ALJ] is presiding[] is entitled to confidential treatment"); *id.* ("The [ALJ] shall also decide . . . whether information designated confidential by the supplier is entitled to confidential treatment.").

[10] 19 CFR § 210.5(e)(1) ("The supplier of the information or the person seeking the information may, with leave of the [ALJ], request an appeal to the Commission of the [ALJ's] unfavorable ruling[.]").

15

occurs while the investigation is before an [ALJ], any determination on sanctions . . . shall be in the form of" the ALJ's "recommended determination" or by "issuing an order" (depending on the nature of the sanction requested). 19 CFR § 210.34(c)(2). The ALJ's determination is then reviewable by the Commission. *Id.* ("The Commission may then consider both the recommended determination and any related orders in making a determination on sanctions."). The regulations also spell out exactly how to seek appropriate relief for "violation of a protective order" through a "motion for sanctions" (19 CFR § 210.25(a)) and instruct parties that such a motion "should be filed promptly after the [violation] is discovered." *Id.* The regulations further instruct that a "motion for sanctions shall be addressed to the presiding [ALJ] . . . if the [violation] occurred and is discovered while the [ALJ] is presiding in an investigation," *id.* § 210.25(b), and the ruling "may be appealed" to the Commission. *Id.* § 210.25(d).

The sanctions available at the ITC for a protective order violation are broad, including "[s]anctions of the sort enumerated in § 210.33(b), or such other action as may be appropriate." 19 CFR § 210.34(c)(3). Under section 210.33(b), available sanctions include any sanction available under Fed. R. Civ. P. 37(b); adverse inferences (19 CFR § 210.33(b)(1), (2)); evidence and issue preclusion (*id.* § 210.33(b)(3)); evidence and issue objection preclusion (*id.* § 210.33(b)(3), (4)); and striking "motions or other submissions" concerning the violation. *Id.* § 210.33(b)(5). Thus, if Shoals genuinely believed Voltage used CBI in violation of the protective order to develop redesigns that might "avoid restrictions" ordered by the ITC—an allegation that Shoals formed as early as mid-August

16

2025 when Shoals filed its FAC (and likely earlier given the *Human Milk* adjudication at the ITC)—Shoals could have raised these allegations to the ALJ to (1) adjudicate whether a violation has occurred and (2) determine any appropriate, such as precluding consideration of the redesign, as provided for by Commission regulations. Instead, Shoals proceeded through a five-day evidentiary hearing before the ALJ and two rounds of post-hearing briefing, never once alleging a violation to the ITC.

Thus, as it relates to North Carolina law, Shoals' immediate resort to the UDTPA is improper because "there already exists an extensive regulatory regime to address the violations." *Champion Pro Consulting Grp.*, 845 F.3d at 110. Likewise, even if the claim is not outright dismissed under the North Carolina doctrine, the federal doctrine of primary jurisdiction warrants at least a stay and either a referral or instruction for Shoals to raise the issue first to the ITC. Shoals is raising an unprecedented claim that calls into question both the nuanced interpretation of the ITC protective order and counsel's permissions during adjudication of redesigns during the ITC-specific *Human Milk* adjudication process. As the regulations implore—and common sense dictates—the ITC should be the first to opine on whether Voltage engaged in misconduct in the ITC proceedings. *See Alberta Gas Chems., Ltd. v. Celanese Corp.*, 650 F.2d 9, 13–14 (2d Cir. 1981) (ordering primary jurisdiction stay of unfair competition and fraud claims based on allegations of perjury at ITC hearing: "We find no reason, therefore, not to give the Commission the opportunity to resolve in the first instance the major issues in this litigation."); *Meditech Int'l Co. v. Minigrip, Inc.*, 648 F. Supp. 1488, 1496 (N.D. Ill. 1986) (same for antitrust and RICO

17

claims based on allegations of misleading the ITC in a patent case: "If Meditech has evidence that Minigrip has misled or is now misleading Commission by not disclosing relevant information or other acts, that evidence too must be put to Commission.").

Finally, Voltage notes that despite premising the new tort claims on violation of the ITC protective order (in the FAC, SAC, and TAC), Shoals' comments at the recent status conference suggests Shoals may be pulling "another rabbit out of their hat." Oct. 9, 2025 Status Conf. Tr. at 77:1–4 ("THE COURT: Yes, yes. They can't pull another rabbit out of their hat. Mr. Belanger, no more rabbits."). During the conference, Shoals' counsel curiously claimed that its tort claims are not based on an ITC "order" but rather some "stipulation" which Shoals claimed "the ITC would not have the ability" to enforce. *Id*. 46:3–10 ("That's . . . the subject of our tort claim on the unfair competition because the ITC would not have the ability -- it was a stipulation entered, not an order of the Court, so it's not a contempt proceeding.").

But the TAC does not mention any stipulation, and neither did the FAC or the SAC. Instead, the tort claims are premised solely on (1) entry of the "Protective Order dated February 20, 2025," TAC ¶ 43; (2) "Following entry of the Protective Order, Shoals produced to defendants certain [CBI]," *id*. ¶ 44; (3) "Thereafter, on information and belief, Defendants used Shoals's [CBI] to create purported 'alternative designs,'" *id*. ¶ 45; and (4) these facts constitute "violations of the Protective Order." *id*. ¶ 75. The ITC protective order is mentioned no less than eight times in the TAC, but there is no mention of an alleged stipulation. The Court should reject any belated attempt by Shoals to introduce a new

18

theory based on alleged stipulation mentioned nowhere in its FAC, SAC, or TAC—respectfully, no more magic tricks.

### E. Shoals' Claims Targeting "Alternative Designs" Should Be Dismissed for Failure to Allege an Infringing Act and Under Patent Preemption Principles

For avoidance of doubt, Voltage addresses three remaining issues relating to the "alternative designs" applicable to the tort claims and the patent claims.

First, to the extent Shoals has not alleged a plausible claim of a protective order violation resulting in improper use of CBI, Shoals cannot pursue tort claims based the "alternative designs" under any theory currently alleged. For example, Shoals cannot pursue a tort claim based solely on the fact that the alternative designs infringe—or "further infringe"—the Asserted Patents, as such a claim would be preempted by federal patent laws. *See Convatec, Inc. v. HR Pharms., Inc.*, No. 24-cv-1248, 2025 WL 1859228, at *2 (D. Del. June 10, 2025) (state tort claims, including unfair competition, based on patent infringement are preempted by federal patent laws). Likewise, Shoals' alternate theory—that the alternative designs might not infringe and might "avoid restrictions" imposed by the ITC—is essentially just a claim that the alternative designs do not infringe. There is no cause of action for non-infringement of a patent, whether under state law or federal law.

Second, to the extent Shoals is asserting that the alternative designs infringe any of the Asserted Patents (whether the '375, '376, or '295 Patents), those claims fail too because Shoals has not alleged any infringing act in the United States. *See* 35 U.S.C. § 271(a) (patent infringement requires allegations that the defendant "makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any

19

patented invention"). As Shoals has made clear, the accused products are made in China. *See, e.g.*, TAC ¶ 33 ("the Accused Products are manufactured . . . in China"); *see Pulse Elecs., Inc. v. U.D. Elec. Corp.*, 530 F. Supp. 3d 988, 1009 (S.D. Cal. 2021), *aff'd*, No. 2021-1856, 2022 WL 1436146 (Fed. Cir. May 6, 2022) (no infringing act under Section 271 where "no dispute that Defendant makes its products in China" and no indication "Defendant sold the Accused Products in the U.S."). And Shoals has not alleged any other act other than merely asserting a "theoretical [] construct" to the ITC, which Shoals agrees "wouldn't be any activity that could be subject to an infringement claim."[11] Thus, as Shoals has not alleged a cognizable infringing act under the patent laws, Shoals' patent claims should be dismissed to the extent based on the newly raised "alternative designs."

Finally, even if Shoals could allege an infringing act, Shoals has made no attempt to allege non-conclusory facts to support a plausible claim that the alternative designs infringe any of the Asserted Patents. As explained, Shoals does not even identify what the alternative designs are, and Shoals only asserts the conclusory allegation that they "further infringe on the '375 Patent and the '376 Patent." TAC ¶ 46. These conclusory allegations are insufficient. *See Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1353–55 (Fed. Cir. 2021) (affirming dismissal of patent claims where plaintiff "failed to provide factual allegations supporting a plausible inference" the product at issue infringed); *Alexander v.*

---

[11] *See* Oct. 9, 2025 Status Conf, Tr. at 44:4–13 ("I would say that based on our current understanding, it's not clear whether Voltage has commercialized these alternate designs or whether they're just theoretically. . . . If they're noncommercial and it's just a theoretical litigation construct, then there wouldn't be any activity that could be subject to an infringement claim.").

*BMW of N. Am. LLC*, No. 22-cv-1488, 2023 WL 6066563, at *2 (D. Del. Sept. 18, 2023) ("Because the Complaint does not allege factual allegations beyond the identities of the Defendants and the accused vehicles and the conclusory assertion that the [systems] infringe [the] patent, it does not plausibly allege infringement.").

## III.    CONCLUSION

For the reasons above, Shoals' tort claims in the TAC should be dismissed and Shoals' patent claims should be dismissed to the extent based on the "alternative designs."

21

Respectfully submitted this 17th day of October, 2025.

By: */s/ Robert C. Van Arnam*
Robert C. Van Arnam (N.C. Bar No. 28838)
Jenny J. Wang (N.C. Bar No. 61255)
Aaron T. Fadden (N.C. Bar No. 59495)
WILLIAMS MULLEN
P.O. Box 1000
Raleigh, NC 27602-1000

Bruce S. Yen, CA Bar No. 277920*
Philip Ou, CA Bar No. 259896*
Yar R. Chaikovsky, CA Bar No. 175421*
WHITE & CASE
3000 El Camino Real
2 Palo Alto Square, Suite 900
Palo Alto, CA 94306

Jordan Coyle, DC Bar No. 1006391*
WHITE & CASE
701 Thirteenth Street, NW
Washington, DC 20005

***Counsel and \*Local Civil Rule 83.1(d)
Counsel for Defendants
Voltage, LLC and Ningbo Voltage Smart
Production Co.***

22

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing Motion to Dismiss Third Amended Complaint is in compliance with Local Rule 7.3(d) and does not exceed the limit of 6,250 words, as calculated by the word count feature of Microsoft Word.

## CERTIFICATE OF SERVICE

I certify that on this day, the foregoing document was filed electronically by using the Middle District of North Carolina CM/ECF system. Notice of this filing will be sent to all parties and counsel of record by operation of the Court's electronic filing system. The foregoing was also served on counsel for Plaintiff via electronic mail, pursuant to an agreement between the Parties.

    Dated: October 17, 2025

By: */s/ Robert C. Van Arnam*
Robert C. Van Arnam
WILLIAMS MULLEN