# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| SHOALS TECHNOLOGIES GROUP, LLC, | ) ) ) | |
| Plaintiff, | ) ) | Civil No. 1:25-cv-00026 |
| v. | ) ) | |
| VOLTAGE, LLC, and NINGBO VOLTAGE SMART PRODUCTION CO., | ) ) ) ) | By: Michael F. Urbanski Senior United States District Judge |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

This matter is before the court on defendants Voltage, LLC and Ningbo Voltage Smart Production Co.'s ("Voltage") equitable defenses to the patent infringement lawsuit filed by plaintiff Shoals Technologies Group, LLC ("Shoals"). Voltage seeks, <u>inter alia</u>, to have the patents[1] asserted in this patent infringement suit declared unenforceable.

A bench trial on Voltage's equitable defenses was held on February 25-27, March 3-5, and May 7, 2026.[2]

---

[1] The three patents at issue are: U.S. Patent No. 12,015,375 (the "'375 patent"); U.S. Patent No. 12,015,376 (the "'376 patent"); and U.S. Patent No. 12,407,295 (the "'295 patent").

[2] The bulk of the bench trial was conducted in Winston-Salem in late February and early March. By Order dated April 15, 2026, ECF No. 472, the court heard additional testimony regarding certain October 2023 emails on May 7, 2026. Although Shoals sent the court a letter dated May 28, 2026, the court did not consider it in connection with this memorandum opinion.

After consideration of the evidence and arguments,[3] the court concludes that Voltage has not met its burden of establishing inequitable conduct or unclean hands by Shoals rendering the patents unenforceable. Accordingly, as detailed in the following Findings of Fact and Conclusions of Law, Voltage's motion to declare the '375, '376, and '295 patents unenforceable is **DENIED**. However, as will be explained, the court **TAKES UNDER ADVISEMENT** until trial the impact of the acceleration of the prosecution of Shoals's patents resulting from the February 21, 2024, violation of the Prosecution Bar Stipulation on any damages which may be awarded in this case.

## FINDINGS OF FACT

### A. Background of Patents and Shoals/Voltage Dispute.

1. Shoals owns a number of patents concerning inventions, called lead assemblies, to connect solar panel arrays to a power inverter. Family history relevant to the '375, '376, and '295 patents in suit include Patent No. 10,992,254 (the "'254 patent"), issued on April 27, 2021, and Patent No. 11,689,153 (the "'153 patent"), issued on June 27, 2023.

2. On May 4, 2023, Shoals, by counsel, filed a Section 337 Complaint with the United States International Trade Commission ("ITC"),[4] alleging infringement by

---

[3] Throughout this case, the parties have sought to seal vast amounts of evidence and argument based on protective orders entered in this case or in connection with International Trade Commission proceedings. As the court has made clear, both under the common law and the First Amendment, the public has a right to know the basis upon which federal courts make their decisions. The court does not believe that anything in this Memorandum Opinion contains confidential business information of the parties requiring it to be docketed under seal. To the extent that certain information contained in this Memorandum Opinion was previously filed under seal, those sealing orders are **VACATED**.

[4] The United States International Trade Commission is an independent federal agency which, inter alia, "is required by statute to conduct investigations of possible patent infringement at the border." F. Scott Kieff

Voltage and others of Shoals's patented lead assembly technology, including claims in Shoals's '254 patent.

3.      On June 5, 2023, the ITC instituted an investigation styled: In the Matter of CERTAIN PHOTOVOLTAIC CONNECTORS AND COMPONENTS THEREOF, Investigation No. 337-TA-1365 (the "1365 Investigation").[5]

4.      Counsel for Shoals in the 1365 Investigation was the law firm of Maschoff Brennan. One of its partners, Eric Maschoff, was counsel of record for Shoals in the 1365 Investigation. Eric Maschoff Test., ECF 412, at 477.[6]

5.      An Administrative Law Judge ("ALJ") entered a Protective Order in the 1365 Investigation on June 7, 2023, limiting use of Confidential Business Information ("CBI") discovered during the 1365 Investigation solely for the purposes of the investigation. The 1365 Investigation Protective Order did not contain a provision known as a "prosecution bar," generally prohibiting lawyers from using information obtained from competitors during an ITC investigation to prosecute patent applications before the United States Patent and Trademark Office ("USPTO").

6.      As counsel for Shoals in the 1365 Investigation, Eric Maschoff had access to Voltage CBI produced in discovery in that case, including Voltage product samples and alternative designs. Id. at 489-92.

---

Test., ECF No. 415, at 1422.

[5] On July 19, 2023, Shoals filed an amended complaint with the ITC adding infringement of the '153 patent.

[6] The Maschoff Brennan firm did not prosecute the '254 patent, the application for which was filed on September 9, 2015. By 2021, that firm was involved in patent prosecution for Shoals, as Eric Maschoff authorized the filing of the application for the '153 patent on April 8, 2021.

3

7. Shoals filed a continuation application, No. 18/341,655, with the USPTO on June 26, 2023. This application, which claims priority to the '254 and '153 patents, ultimately issued as the '375 patent at issue in this case.

8. Eric Maschoff filed the June 26, 2023, continuation application, No. 18/341,655, as patent counsel for Shoals. Id. at 494. At that time, no Voltage CBI had been produced in the 1365 Investigation. Eric Maschoff Test., ECF No. 413, at 702.

**B. Prosecution Bar Stipulation.**

9. On August 16, 2023, White & Case, counsel for Voltage, sent an email to counsel for Shoals expressing "concerns about [Shoals's] use of Voltage's CBI in this Investigation." DTX-177, at VOLTAGE_00036622. The email stated "We understand that [Shoals's] prosecution counsel is a partner in your Firm and you have indicated that you believe that your prosecution partner should be able to have access to Voltage's CBI. We are concerned that such disclosure could lead to the use of Voltage's CBI to draft patent claims, which would not be a use 'solely for purposes of this investigation.'" Id.

10. On August 18, 2023, Charles Barquist, a Maschoff Brennan partner representing Shoals in the 1365 Investigation, responded as follows:

> There is no evidence that Shoals or its counsel have used or intend to use Voltage CBI other than solely for purposes of this investigation, and there is no basis for any such implication. . . . Eric Maschoff is an integral member of Shoals' litigation team; Voltage is necessarily aware that he was listed on the original complaint and every successive filing. By letter dated June 13, 2023, served on Respondents and filed with the Commission, Mr. Maschoff agreed to comply with the protective order. Voltage's proposal to restrict Mr. Maschoff's involvement mid-investigation is clearly designed to prejudice Shoals' ability to prepare its case for the evidentiary hearing. We do not accede to Voltage's gambit.

Id.

11.     Later that day, August 18, 2023, Voltage's counsel responded that "[w]e have no issue with Mr. Maschoff continuing to be a member of Shoals' litigation team. However, given that Shoals has filed for another continuation, . . . we have concerns as to how Mr. Maschoff could possibly exclude confidential details of Voltage's current and future products from his consideration when continuing to prosecute claims in the same field.  Indeed, this is the exact reason parties seek (and routinely agree to) prosecution bars." Id. at VOLTAGE_00036621.

12.     Counsel for Voltage subsequently proposed a Prosecution Bar Stipulation, to which Shoals's counsel agreed on September 19, 2023. DTX-179, at VOLTAGE_00036628.

13.     On September 20, 2023, counsel for Shoals and Voltage, including the Maschoff Brennan and White & Case law firms, filed with the ITC a STIPULATION BETWEEN COMPLAINANT AND VOLTAGE RESPONDENTS REGARDING PROSECUTION BAR ("Prosecution Bar Stipulation").  Paragraphs 5 and 6 of the Prosecution Bar Stipulation state:

> 5. Maschoff Brennan agrees to institute an ethical wall prohibiting the involvement of all attorneys who have access to Voltage's confidential information disclosed in this Investigation from the prosecution of the continuation application, 18/341,655, and any subsequent related applications.
>
> 6. Nothing herein is intended to alter the restrictions in the Protective Order, including the prohibition of any person who has reviewed confidential information under the Protective Order from using that information for any purpose other than this Investigation, including for patent prosecution.

DTX 218.

14. Robert L. Stoll, former Commissioner of Patents, testified as an expert witness for Voltage on the patent prosecution process. Stoll testified that an ethical bar "would prevent you from discussing anything – any nature of the prosecution of the application from one side to the other." Robert Stoll Test., ECF No. 413, at 798. Stoll testified that a prosecution bar "prevents leakage. I mean, it – it prevents the Patent and Trademark Office from getting information from a source it shouldn't be getting information in the prosecution of the application." Id. at 801.

15. F. Scott Kieff, former Commissioner for the ITC and expert witness called by Shoals on ITC and USPTO procedure, testified that the core purpose of a prosecution bar is "to stop one side from filing patent applications on technology it's taking from the other side. And that's – sounds like a totally understandable legitimate goal. We don't want to foster IP theft. That – that makes great sense." Scott Kieff Test., ECF No. 415, at 1431. But former ITC Commissioner Kieff disagreed that the Prosecution Bar Stipulation in this case should be read to prohibit any involvement as Voltage and former Patent Commissioner Stoll suggest. Former ITC Commissioner Kieff elaborated:

> So I heard yesterday or last week, I guess – the discussion of clean room and full separation. I – I was shocked because I don't understand how, under the Deutsche Bank factors, under ITC statute, under the Rules Enabling Act for this Court, or under the patent office's statutes how – how this degree of extreme separation could be accommodated. Let me explain why.
>
> The patent office has a duty to examine. The patent office has a duty to receive information. The clients have duties to submit to the patent office. So – so this kind of lay or street definition of the word "involvement" can't be the legally operative term without willfully blinding the patent office from operating.

6

> This would interfere with the smooth operation of district court litigation and ITC litigation, and it will drive up costs for every patent client who's hiring counsel because now they have to double hire midway through their investments. That just raises the cost to the rival in an adversarial proceeding.

Id. at 1434.

16. Eric Maschoff testified at trial that he understood that he was subject to the ethical wall in the Prosecution Bar Stipulation. Eric Maschoff Test., ECF No. 412, at 509. Eric Maschoff understood that from the date of the filing of the Prosecution Bar Stipulation forward, he could not be involved in the prosecution of continuation application 18/341,655 or anything else in the '254 patent family. Id. Eric Maschoff characterized involvement as "drafting of claims, analysis of prior art so as to respond to and – respond to examiner rejections; negotiations, or – or – or in-person or on-telephone dialogs with the examiner; signing off on papers, that sort of thing." Id. at 513.

### C. Handoff of Prosecution of 18/341,655 Continuation Application.

17. On September 13, 2023, one week before the Prosecution Bar Stipulation was filed at the ITC, Eric Maschoff sent an email to his partner, Maschoff Brennan registered patent attorney Paul Johnson, asking him to take over responsibility for prosecuting patent application 18/341,655. Eric Maschoff's email identified the continuation application and stated: "Here is the case I mentioned. Please take over responsibility for this matter moving forward. Also, I and the rest of the Shoals ITC team are subject to a protective order whereby we're not able to participate in its prosecution, so we'll need to be walled off from accessing this matter or discussing it with you." DTX-134, at P.JOHNSON00002278. Maschoff Brennan proceeded to block Eric Maschoff and the Shoals ITC team from access to the patent

prosecution files and block Paul Johnson from access to the files of the Shoals ITC matter. Id. at P.JOHNSON00002277.

18.     Paul Johnson testified that Eric Maschoff suggested filing a continuation application in the September "handoff meeting," and that Paul Johnson was not able to get to it immediately. Paul Johnson Test., ECF No. 412, at 320-21.   Eric Maschoff "suggested looking at the litigation materials in the 1365 investigation." Id. at 321. On that day, Paul Johnson had a "substantive discussion about how to prosecute the family going forward." Id. at 324.  Paul Johnson testified:

> My recollection is that he suggested that I read – that – I consider the 1365 litigation materials in the ongoing prosecution, that I file a continuation, and that I avoid – I – summed it up before as 'avoiding claim terms with baggage.' That was my language.
>
> Really it was about addressing plugging any holes that Voltage creates in the claims that we had in the two patents that were at issue.  That may be avoiding certain language that – in some cases was adding other language to address the issues that were being raised by Voltage in the 1365.

Id. at 324-25.  While Eric Maschoff testified consistently that he handed the Shoals patent prosecution over to Paul Johnson in September 2023, he could not recall the substance of their conversation.  Eric Maschoff Test., ECF No. 510, at 24. Eric Maschoff testified that he could not recall a discussion with Paul Johnson about a continuation application in September, stating that after the handoff, "[h]e just took over responsibility, and decisions regarding continuation were up to Paul." Id.

19.     Paul Johnson testified at trial that he understood that the "ethical wall" was "meant to be a block of attorneys from accessing materials on the other side of a wall," and prohibits discussions about those materials. Paul Johnson Test., ECF No. 412, at 230.  It meant that

8

nobody from the Shoals ITC team could be involved in the patent prosecution of this family, including claim amendments and filing new claims. Id. at 235-36.

20.     Paul Johnson's first billing entry for the Shoals big lead assembly patent family was on September 27, 2023.  His time entry for that date stated: "Review related cases and determine whether any of the references cited therein are to be cited in an information disclosure statement (IDS) and coordinate with staff to prepare IDS and review and finalize same and attend to filing IDS." DTX-163, at SHOALS00078430.

21.     Paul Johnson filed an Information Disclosure Statement ("IDS") with the USPTO for application no. 18/341,655 on September 27, 2023. This was done to comply with his duty of candor to the USPTO to disclose material prior art. Paul Johnson Test., ECF No. 412 at 339-341. Voltage expert Robert Stoll testified that Rule 56 "provides that the applicant is required to have a duty of candor and good faith in prosecuting the applications before the patent office." Robert Stoll Test., ECF No. 413, at 799.  Shoals's expert Scott Kieff testified that "Rule 56 is designed to support the patent office's statutory obligation, which is: Get information. Receive information. Consider information." Scott Kieff Test., ECF No. 415, at 1439. See 37 C.F.R. § 1.56. Both experts agreed that the Rule 56 duty to disclose imposes a duty of candor and good faith, and that the duty to disclose to the patent office "covers a broad group of individuals, including anyone substantively involved in prosecution." Scott Kieff Test., ECF No. 415, at 1454.

22.     Paul Johnson testified that while he filed an IDS in September, he had not yet begun a substantive review of the patent family and did not "really dive into it" until November.  Paul Johnson Test., ECF No. 510, at 103.

23. Voltage disputes that the substantive conversation between Eric Maschoff and Paul Johnson regarding strategy for prosecution of this patent family took place on or before September 13, 2023, as Paul Johnson testified at trial. Voltage argues that it is difficult to square Paul Johnson's testimony that these substantive discussions took place in the September 13 timeframe, before the Prosecution Bar Stipulation was filed, with Paul Johnson's statement in his October 18, 2023, email to Eric Maschoff that "I don't even know what's in the litigation or application yet so it would probably be helpful to give me some context." DTX-473, at JOHNSON_MDNC_0000016. Also, Voltage noted that Paul Johnson billed no time on this matter until September 27, 2023, after the Prosecution Bar Stipulation was in place, and his billing entry on October 26, 2023, describes his work performed as "[i]nternal discussion of status of ITC case and begin reviewing publicly available ITC documents from case to identify potential claim amendments and/or new claims to file in application." DTX-164, at SHOALS00078466.[7] When questioned at the May 7, 2026, hearing on this issue, Paul Johnson found no inconsistency in his testimony that the prosecution strategy meeting took place on or before September 13, 2023, noting that it was perfectly consistent to have a high level conversation with Eric Maschoff on prosecution strategy to avoid claim terms in dispute, review the public 1365 Investigation documents, and file a continuation application before he undertook a detailed review of the pending application or ITC litigation. Paul Johnson Test., ECF No. 510, at 135-36. Paul Johnson was a credible witness, and the court finds that the "handoff meeting" at which substantive patent prosecution strategy was discussed between

---

[7] Paul Johnson testified that he did not have a recollection of whether he talked to Eric Maschoff, Jessica Garcia, or both of them, on the date of this billing entry, October 26, 2023, and had no recollection of any conversation.

Eric Maschoff and Paul Johnson to have occurred on or around September 13, 2023, before the Prosecution Bar Stipulation was agreed upon and filed.

### D. October 2023 Communications between Eric Maschoff and Paul Johnson.

24. On October 18, 2023, Eric Maschoff emailed Paul Johnson, the subject of which was "Shoals case you took over." DTX-472, at JOHNSON_MDNC_0000015. Eric Maschoff's email stated: "We've got a lot of new art that we'll need to cite in connection with the pending application (you might also want to review the invalidity contentions to inform possible claim amendments). I think Jessica could give you a link to all of it." Id. In response, Paul Johnson asked Jessica Garcia, a Maschoff Brennan Litigation Support Manager, to "send me the 'new art' and invalidity contentions from the litigation that resulted in Eric's prosecution bar from Shoals app. no. 18/341,655? Please send me any and all art from that litigation so I can make sure it's all cited in this application." Id. Eric Maschoff responded by email that afternoon that "They've made some indefiniteness arguments to think about as well that we should consider in connection with any supplemental claims. Note that none of this involves CBI, so some of this I am free to talk about." DTX-473, at JOHNSON_MDNC_0000016. Paul Johnson responded that he was "[a]vailable when you are. I don't even know what's in the litigation or application yet so it would probably be helpful to give me some context." Id. While the email string referenced Paul Johnson and Eric Maschoff trying to arrange a follow up call, neither Paul Johnson nor Eric Maschoff could recall one. See DTX-475, at JOHNSON_MDNC_0000019; Eric Maschoff Test., ECF No. 510, at 19; Paul Johnson Test., ECF No. 510, at 74. In an October 19, 2023, email, Jessica Garcia provided Paul Johnson

11

with links to S:drive files on prior art, Voltage's invalidity contentions, and supplemental invalidity contentions. DTX-476, at JOHNSON_MDNC_0000022.

25.  Eric Maschoff testified that he emailed Paul Johnson on October 18, 2023, out of a concern that there was potentially additional prior art that needed to be considered for disclosure to the USPTO. Eric Maschoff Test., ECF No. 413, at 714-15. Eric Maschoff testified that his concern was Paul Johnson's disclosure obligation to the USPTO regarding material prior art, and he wanted to make sure that Paul Johnson was aware of and could access the public documents on EDIS at the ITC.  This applied as well to the arguments that Voltage was making in the claim construction briefs regarding indefiniteness.  Eric Maschoff believed Paul Johnson, as patent prosecuting attorney, should be aware of this information. Id. at 721-24.

26.  Robert Stoll, Voltage's patent procedure expert, testified that Eric Maschoff's communications to Paul Johnson about filing an IDS to identify additional prior art indicates that Eric Maschoff was still involved in the prosecution.  Robert Stoll Test., ECF No. 413, at 805. While Voltage asserts that any communication between Eric Maschoff and Paul Johnson violated the Prosecution Bar Stipulation, rendering the '375, '376, and '295 patents unenforceable,  Shoals's ITC and patent procedure expert Scott Kieff strongly disagreed:

> I have consistently for 30 years taught my students: Send to the prosecuting attorney information that might be material or that might be inconsistent with any position taken. And send it as soon as you can so that then, in a cost-effective way, that person can make the conflicting determinations about what the examiner might think, what a person of ordinary skill in the art might think. That person has to make those determinations.
>
> These are battlefield determinations. They can be wrong. And you can decide that they're wrong. But any system that directs

12

> professionals to make battlefield determinations has to be mindful about enabling the profession, or we all lose the profession. Professionals have to get things wrong. They can blow themselves up.

> Careers get lost. Entire lines of work can become hard, and the patent office becomes blinded if you get any of this wrong, because then parties won't be sending, either to the office or to the Paul Johnsons of the world. We want to make sure that we figure out with somber acute awareness of the conflicting duties and make sure we leave room to maneuver for them.

Scott Kieff Test., ECF No. 415, at 1443-44.

27.     As Paul Johnson further testified on May 7, 2026, the October 2023 emails between Paul Johnson, Eric Maschoff, and Jessica Garcia established that on October 19, 2023, Garcia provided Johnson with links to S:drive files containing public information regarding Voltage's prior art and invalidity contentions at the 1365 Investigation. DTX-476, at JOHNSON_MDNC_0000022. Paul Johnson testified that his billing entry on October 26, 2023, of 1.1 hours would have referred to his review of these ITC documents, and that he did not learn from Jessica Garcia how to access public ITC documents from EDIS until October 30, 2023. DTX-477, at JOHNSON_MDNC_0000024. See Paul Johnson Test., ECF No. 510, at 71.

28.     On October 30, 2023, Paul Johnson emailed Jessica Garcia that "I need to review publicly available docs for this ITC case.  There's an ethical wall in place preventing me from accessing the S4079.000021 workspace in imanage.  Can you let me know where/how I can access the public record?" DTX-474, at JOHNSON_MDNC_0000018.  Jessica Garcia

13

responded by stating that "[a]nyone can create an account on EDIS. This will let you search by the investigation number (337-TA-1365) and only look at public documents." Id.[8]

29.     After this date, Paul Johnson was able to access through EDIS other public documents regarding the 1365 Investigation, including the complaint, the amended complaint, Voltage's response, Voltage's response to the amended complaint, the joint claim construction brief, and respondent's claim construction brief. Paul Johnson Test., ECF No. 412, at 285, 327.

30.     On November 3, 2023, Paul Johnson billed 5.7 hours for work identified as "Continue reviewing publicly available ITC documents from case to identify potential claim amendments and/or new claims to file in application." DTX-165, at SHOALS00078490.

31.     On November 6, 2023, Paul Johnson billed 4.6 hours for work identified as "Detailed review of prior art and respondent's prior art arguments in ITC case to identify claims for continuation." Id. at SHOALS00078491.

32.     On November 7, 2023, Paul Johnson billed 7.1 hours for work identified as "Review prosecution histories of ancestor applications and prepare continuation claims to claim disclosed but unclaimed subject matter in view of prosecution histories and respondent's arguments and prior art in ITC case." Id.

33.     Paul Johnson testified that his EDIS access was limited to public information, Paul Johnson Test., ECF No. 412, at 296, and he "did not discuss confidential information with Mr. Maschoff at any time." Id. at 354. Paul Johnson testified that he was never provided any

---

[8] The glossary on the ITC website states that "EDIS serves as the Commission's electronic repository for documents filed in Commission investigations. . . . It also allows members of the public to search on line for documents filed on EDIS, including the public version of documents submitted in the course of most Commission investigations." usitc.gov/glossary/term/electronic-document-information-system-edis, last visited May 6, 2026.

CBI from the 1365 Investigation from Eric Maschoff or anyone else. Id. at 423. Nor did he try to access any confidential documents. Id. at 354. Paul Johnson testified that he did not believe that the amendments he filed with regard to the prosecution of the patents that issued as '375 and '376 contained any Voltage CBI gleaned from the 1365 Investigation. Id. at 422.

34. Nor was there any evidence that Eric Maschoff shared any of Voltage's CBI with Paul Johnson in these October conversations or later. Eric Maschoff testified that he was defending the validity of the patent and his main focus was on that part of the case. Eric Maschoff Test., ECF No. 412, at 552-53. At the same time, there is no dispute that Eric Maschoff, as part of the 1365 Investigation litigation team for Shoals, was exposed to Voltage CBI about its alternative designs. Id. at 552, 565. In fact, Eric Maschoff took the deposition of Dr. Thomas Kenny, Voltage's invalidity expert on January 5, 2024, and part of that deposition touched on whether Voltage's alternative designs had ever been tested. Eric Maschoff Test., ECF No. 412, at 555-565.

35. Paul Johnson agreed that Eric Maschoff's October 18, 2023, email advising him of prior art and invalidity contentions accelerated his prosecution work, but he did not believe that Eric Maschoff was actively involved in the prosecution of the big lead assembly family of patents after the September 2023 "handoff meeting." Paul Johnson testified that he had no recollection of Eric Maschoff having any substantive involvement in the prosecution of this patent family in October or November 2023. Paul Johnson Test., ECF No. 510, at 113-14. Paul Johnson testified that he had no intention of violating the Prosecution Bar Stipulation and did not do so. Id. at 100-01.

15

36.     On October 26, 2023, Shoals and Voltage submitted a joint claim construction chart to the ITC. DTX-026. This joint claim construction chart included the position of the parties and ITC Staff regarding certain claim terms, including mold related terms. In this chart, Shoals and Voltage disagree as to the construction of the terms "undermold" and "primary mold." Voltage's position was that "undermold" be read as "innermost mold shaped or formed directly over an already existing piece or part, and over which an overmold is shaped or formed." Id. at P.JOHNSON00001103-05. Voltage proposed that the term "primary mold" be read as "innermost mold." Id. Shoals proposed that the terms be given their plain and ordinary meaning such as "molded material over a piece or part that acts to seal against environmental factors." Id. The Staff proposed "undermold" be read as "shape of material molded over a piece or part that acts as the primary mold to seal against environmental factors," and that "primary mold" be read as "shape of material molded over a piece or part that seals against environmental factors." Id.

37.     On November 2, 2023, Voltage filed its opening claims construction brief with the ITC. PX-199. There, Voltage argued claims 21 and 24 "use the term 'primary mold' in substantially the same way as independent claim 1 uses the term 'undermold.'" Id. at P.JOHNSON00001147. Voltage argued that "Shoals' proposal is nothing more than just 'mold'—which cannot be correct, and should be rejected." Id. at P.JOHNSON00001148.

38.     On November 10, 2023, Paul Johnson filed a preliminary amendment to application no. 18/341,655 (which ultimately issued as the '375 patent). In this amendment, Paul Johnson changed the text in claim 1 from "undermold" to "mold" and in claim 17 replaced "undermold" with "primary mold."

16

39.     On November 29, 2023, Paul Johnson filed application no. 18/523,464, which ultimately issued as the '376 patent. Claim 1 describes "one or more mold structures . . . substantially sealing the region of electrical interconnection from external environmental conditions." PX-26, at PX-0026.0011. This application was filed under the Track One procedure, which enables expedited review by the patent office. Robert Stoll, Voltage's patent procedure expert, testified that because application no. 18/523,464 (which issued as the '376 patent) was filed as Track One, it naturally accelerated the examination of the related application no. 18/341,655 (which issued as the '375 patent). Robert Stoll Test, ECF No. 413, at 829.

40.     The parties vigorously dispute the import of the communications between Eric Maschoff and Paul Johnson in October 2023. Paul Johnson testified that he reviewed the joint claim construction chart from the 1365 investigation and that "informs the amendments he made in that preliminary amendment." Paul Johnson Test., ECF No. 412 at 379. Eric Maschoff testified that Figures 32 and 34 of the '153 patent show "a dual-mold – or the undermold-overmold combination." Eric Maschoff Test., ECF No. 413, at 700. Eric Maschoff "was never of the view or thought that the notion of a drop line or drop line cable at any level constituted CBI." Id. at 717. Eric Maschoff did not consider the use of one mold to be Voltage confidential information "[b]ecause it was already in our patent." Id. at 726.

41.     Voltage's technical expert witness, Dr. Kimberly Cameron, disagreed, opining that the November 10, 2023, preliminary amendment to application no. 18/341,655 and the November 29, 2023, filing of application no. 18/523,464 contained changes to the mold terms which stemmed not from the 1365 pleadings, but rather were done to cover Voltage's

17

confidential alternative designs. Kimberly Cameron Test., ECF No. 414, at 934. Dr. Cameron testified that "from a technical perspective, it doesn't make sense that if you are concerned about constructions related to the '254 and '153 patent that you would change not "primary mold," but "undermold." Id. at 931. Dr. Cameron explained:

> But what is basically the technical link between what's going on in the 1365 investigation and here is that, in that investigation, there is – there is alternative designs that are being disclosed.
>
> And when you look at this claim and when you look at the other amendments that are being made, without getting into too much detail of exactly what the alternative design structure is – I think I can say this because I heard it – is that they have a two-segment mold and some other features that basically make it difficult for those original claims to cover those alternative designs.
>
> And when you look, technically, at these claims after the amendment has been made in original claim 1 of the '376 patent, you start to see the technical difference.
>
> So now rather than having language that does not cover the alternative designs, now they're starting to be arguments available that perhaps the alternative designs are covered.

Id. at 933.

42. On the other hand, Dr. Daniel Codd, Shoals's technical expert, testified that the November 10, 2023, amendments were "supported by the publicly available documents and the specifications at that time." Daniel Codd Test, ECF No. 415, at 1225. Dr. Codd explained:

> Those amendments are supported, in my view. The design intent is to protect against environmental, whether its moisture or physical protection, corrosion protection. And a person of ordinary skill would interpret that mold, whether it's mold or clarified with the primary under or over. Just simply stating it "mold" would achieve the same effect.

Id. at 1228. Dr. Codd testified that a person of ordinary skill in the art would understand from the joint claim construction chart there to be a dispute as to whether the primary mold was limited to the innermost mold and that filing an amendment to "avoid that 'undermold' modifier and simply state 'mold' to accomplish the goal of encapsulating the nexus." Id. at 1228-30. Dr. Codd also testified that using the term "one or more mold structures" was reasonable from the perspective of a person of ordinary skill in the art as supported by the original specification. He testified "the original spec calls that out explicitly. There could be an undermold, an overmold, or a singular mold to provide environmental protection." Id. at 1235.

43. From a patent procedure standpoint, Voltage's expert Robert Stoll testified that it was unusual to file a preliminary amendment to a patent application without some sort of triggering patent office action. Robert Stoll Test., ECF No. 413, at 809-10. But former Commissioner Stoll agreed that there was nothing wrong in and of itself with filing a preliminary amendment and that it is an accepted procedure. Id. at 861. Former ITC Commissioner Kieff could not understand former Patent Commissioner Stoll's concern about Paul Johnson filing a preliminary amendment as it is expressly allowed by patent office regulation, 37 C.F.R. § 1.115, and is "often advantageous." Scott Kieff Test., ECF No. 415, at 1419.

**E.     February 21, 2024, Communications between Eric Maschoff and Paul Johnson.**

44. Paul Johnson filed an IDS for the '464 application on January 19, 2024, disclosing prior art to the USPTO, some of which he had obtained from his review of public materials from the 1365 Investigation. Paul Johnson Test., ECF No. 412, at 399-400.

45. On February 14, 2024, Paul Johnson filed with the USPTO a Response To Office Action Dated January 12, 2024. DTX-061.

46. On February 20, 2024, the Administrative Law Judge ("ALJ") on the 1365 Investigation issued a <u>Markman</u> order.[9] PX-0013. This <u>Markman</u> order was a public document.

47. On February 21, 2024, Charles Barquist of Maschoff Brennan emailed the ALJ's <u>Markman</u> order to the Shoals 1365 Investigation team. DTX-131, at P.JOHNSON00002224.

48. That same morning, Eric Maschoff sent an email to Paul Johnson forwarding the <u>Markman</u> order and stating: "Will you take a look at this in connection with our pending claims?" <u>Id.</u>

49. Eric Maschoff and Paul Johnson traded emails a few more times that morning. In an email at 10:05 a.m., Eric Maschoff wrote:

> In particular the aperture language: the "partially extending" language would be nice to avoid (which I think you did). The second and third apertures merely extend through the mold so as to accommodate a corresponding drop line and facilitate electrical connection at a nexus with the feeder cable.

<u>Id.</u> Paul Johnson responded at 10:55 a.m.:

> The first CON that you filed has been published and the first and only OA response in that CON is attached. The claims don't use "aperture" anywhere. Independent claims 1 and 17 recite variations of "one or more drop line pathways that each extend partially through the monolithic mold".

---

[9] In <u>Markman v. Westview Instruments, Inc.</u>, 517 U.S. 370, 388 (1996), the Supreme Court held that construction of patent terms is for the court, not the jury, to decide. "[J]udges, not juries, are the better suited to find the acquired meaning of patent terms."

> The second CON that I filed under track 1 isn't publicly available yet. Can I discuss/share that one with you without running afoul of the prosecution bar?
>
> I'm going to analyze the Markman order and pending claims in the two CONs unless you tell me otherwise.

Id. Eric Maschoff replied: "I'd like to see if we can eliminate use of 'extending partially through.' Could we say 'extending at least partially through'" Id. at P.JOHNSON00002223. Paul Johnson responded: "Sure. I can file a supplemental amendment. Should I bother going through the Markman order or just discuss it with you if you're already up to speed?" Id. Eric Maschoff emailed Paul Johnson to "Hold off on supplemental amendment until we talk," id., to which Paul Johnson replied: "Understood. That's the plan." Id.

50.     Paul Johnson and Eric Maschoff spoke on February 21, 2024. Paul Johnson testified that he was unfamiliar with Markman orders and wanted more information about them. Paul Johnson testified that Eric Maschoff provided some suggestions for claim amendments of pending '375 patent applications in the '254 patent family and that his discussion with Eric Maschoff was "generally about prosecution strategy for the '254 patent family." Paul Johnson Test., ECF No. 412, at 208.

51.     Eric Maschoff testified that his email was not "telling him anything.  I asked him to look into it, is how I read that. . . . I had no idea what was happening in the prosecution or what he has done or what priority he was dealing with." Eric Maschoff Test., ECF No. 412, at 531.  Eric Maschoff gave Paul Johnson a suggestion to consider for amending the claim terms concerning the language "extending at least partially through." Id. Eric Maschoff did not think that sending these emails violated the Prosecution Bar Stipulation because "the public nature of the Markman order that was issued by the judge in the case that directly

21

implicated the claim language that we were talking about here was something that Paul should necessarily have in front of him." Id. at 532. Maschoff continued:

> THE COURT: You didn't think you violated the prosecution bar because the Markman order was public?
>
> THE WITNESS: Public. And it was potentially relevant to his ongoing prosecution activities with respect potential indefiniteness of the claims as it pertained to that claim language. . . .
>
> THE COURT: Right. But you didn't just send him the opinion. You sent him the opinion with – with some suggestions, right?
>
> THE WITNESS: I did, yes.
>
> THE COURT: Do you think that was – ran afoul of the prosecution bar stipulation?
>
> THE WITNESS: I didn't because the – the language that I was suggesting was, I felt, apparent from the Markman order itself. That was – that was what I felt, it was apparent.

Id. at 532-533.

52. Although the email string refers to a planned conversation between Paul Johnson and Eric Maschoff, Eric Maschoff had no recollection of that conversation. Id. at 485, 538, 539, 542.

53. While Paul Johnson did not have an independent recollection of his conversation with Eric Maschoff, he was able to testify about notes he took during that conversation. Paul

22

Johnson's notes, admitted into evidence as DTX-411, state as follows:[10]

> 2/21/24 discussion with Eric
> - 2nd and 3rd apertures, we don't care if it extends all the way through. We just want it to accommodate a drop line so it can electrically connect to feeder cable at nexus
> - Must retain drop line so you can retain connection at the nexus.
> - Independent claim that is narrower and requires presence of compression lug and the compression lug sort of surrounds the nexus or forms the nexus. Nice to have that at least one mold that together with the compression lug encapsulates the nexus to provide the sealing function.
>   - Eric would love to say at least one mold that surrounds the compression lug and the nexus so as to provide a sealing effect of the nexus.
>   - Trying to imply that more than one mold
> - We want a primary mold that does not necessarily
> - **Ignore all of the above. Instead, add new claim directed to Figs. 35, 37 where a single drop-line cable passes through mold via single pathway but forms two drop lines.**

DTX-411.

54. At trial, Voltage questioned Eric Maschoff about whether the references in Paul Johnson's notes to "at least one mold" and "single drop-line cable passes through mold via single pathway but forms two drop lines" stemmed from the expert report of Dr. Thomas Kenny, Voltage's invalidity expert in the 1438 Investigation who Eric Maschoff had deposed a month before the <u>Markman</u> order issued, as opposed to the <u>Markman</u> order itself. Eric Maschoff Test., ECF No. 413, at 603-22. To be sure, the cited portions of Dr. Kenny's December 1, 2023, expert report discuss a two segment undermold and a single cable forming

---

[10] Certain portions of the February 21, 2024, notes are highlighted in red. Paul Johnson testified that while he did not have a recollection why these were highlighted in red in these notes, his general practice is to treat red highlighting "like a stop sign. It tells me to ignore or disregard the – the content that's highlighted red." Paul Johnson Test., ECF No. 412, at 210.

two drop lines. DTX-432. Eric Maschoff was aware of those aspects of Dr. Kenny's report as evident from the deposition he took on January 5, 2024. But it is difficult to parse this section of Dr. Kenny's report from the <u>Markman</u> order as Dr. Kenny's report itself makes several references to the issues pending at the December 13, 2023, <u>Markman</u> hearing regarding these concepts. <u>See</u> DTX-432, at 493, 496-97. While Voltage's counsel sought to establish that Eric Maschoff's conversation with Paul Johnson stemmed from his review of the Kenny report and his deposition of Dr. Kenny on the subject of Voltage's alternative designs, there was no evidence that Eric Maschoff discussed Voltage's alternative designs with Paul Johnson. Eric Maschoff testified that his discussion with Paul Johnson "was driven by the <u>Markman</u> order." Eric Maschoff Test., ECF No. 413, at 618. And the timing supports Eric Maschoff's testimony as the conversation took place the day after the <u>Markman</u> order issued.

55.     Paul Johnson testified that the first time Shoals sought claims in this patent family using the term "drop line cable" was in his February 22, 2024, supplemental response. Paul Johnson Test. ECF No. 412, at 268-69. But he testified that "[a]s between the notes and the <u>Markman</u> order," the <u>Markman</u> order "formed the basis for [his] amendments to the claim language adding 'drop line cable.'" <u>Id.</u> at 358.

56.     Paul Johnson was very clear that while Eric Maschoff provided him a copy of the <u>Markman</u> order and had a brief discussion with him about it, it was his detailed review of the <u>Markman</u> order that determined what amendments to pursue, including regarding the term "drop line cable." <u>Id.</u> at 355-360. Paul Johnson testified:

> THE COURT:     What role, if any, did Mr. Maschoff's comments to you play in your proposed amendment that you filed the next day?

THE WITNESS: I -- I can't preclude the possibility that they influenced me. But I went through that Markman order and I chose the amendments to make. I believe that some of them were even inconsistent with the - - notes that I took that said, ignore everything, just do this. I still did what I thought was appropriate based on my review of the Markman order.

Id. at 360. The questioning continued:

THE COURT: At the end of the day, and as a result -- and considering your conversation with Mr. Maschoff, considering your review of the Markman order, was anything that you put in those amendments intended to deceive or mislead or fail to inform the patent office about those amendments you filed?

THE WITNESS: No.

Id. at 362.

57. Paul Johnson testified that his conversation with Eric Maschoff lasted 10-15 minutes, id. at 374, and that there was nothing in that conversation that wasn't publicly available in the Markman order. Id. at 372.

58. Paul Johnson's billing statements for February 21, 2024, state:

Review and analyze Markman Order from related ITC dispute and pending claims; Internal conference to discuss implications of same with respect to pending claims; Prepare supplemental amendment and response and file at USPTO.

DTX-160, at SHOALS00078348. Paul Johnson billed 6.9 hours for this time entry, the bulk of which was reviewing the Markman order. Paul Johnson Test., ECF No. 412, at 373-74.

59. Eric Maschoff testified that he has no recollection of his February 21, 2024, conversations with Paul Johnson. Eric Maschoff Test., ECF No. 412, at 538.

60. The next day, February 22, 2024, Paul Johnson filed a Supplemental Response to Office Action Dated January 12, 2024. DTX-065. Paul Johnson testified that this

25

Supplemental Response "was a result of me analyzing the <u>Markman</u> order. My own independent analysis; I determined what additional amendments to make." Paul Johnson Test., ECF No. 412, at 216. Paul Johnson conceded that his independent analysis was done after his conversation with Eric Maschoff and "taking note of his suggestions." <u>Id.</u>

61.     Voltage's patent procedure expert, Robert Stoll, testified that it was unusual to have two responses to a patent office action in eight days without some intervening patent office action. Robert Stoll Test., ECF No. 413, at 812.

62.     In the Supplemental Response filed by Paul Johnson on February 22, 2024, the only change to claim 1 of the '375 patent application was to add "at least" in front of "partially through," as Eric Maschoff had suggested. Paul Johnson Test., ECF No. 412, at 217. Paul Johnson testified that he had filed a supplemental response to an office action only a handful of times before and that it was pretty rare. <u>Id.</u> at 221.  While the emails and call with Eric Maschoff alerted Paul Johnson to the existence of the <u>Markman</u> order in the 1365 Investigation, he testified that he "chose to review the <u>Markman</u> order in detail and make supplemental amendments that I thought were warranted by the <u>Markman</u> order." <u>Id.</u> at 225.

63.     Paul Johnson testified that Eric Maschoff's forwarding of the <u>Markman</u> order "accelerated the prosecution of these claims." <u>Id.</u>  He explained that "[i]t impacted the timing. I do not believe that it impacted the substance." <u>Id.</u> at 240. That is because Paul Johnson was not monitoring the ITC case and "only acted in response to something in the ITC case when someone on the ITC case team, such as Mr. Maschoff, reached out" to him.  <u>Id.</u> at 226. Paul Johnson explained that receiving the <u>Markman</u> order from Eric Maschoff "accelerated the timing of me doing it. I do not believe that it cut down the amount of time that I spent doing

it." Id. at 378. Paul Johnson doubted that it would have taken him more than a month or two to get the Markman order from EDIS as opposed to getting it from Eric Maschoff. Id.

64. Dr. Codd, Shoal's technical expert, agreed that Paul Johnson's review of the Markman order had an impact on the claims ultimately allowed as it "informed him of the matters at hand." Daniel Codd Test., ECF No. 415, at 1353. Both parties recognize the importance of the Markman order on the claims allowed in the '375 patent. Robert Stoll, Voltage's patent procedure expert, testified that Eric Maschoff's forwarding the Markman order to Paul Johnson within an hour of receiving it "significantly accelerated the pace of the prosecution." Robert Stoll Test., ECF No. 413, at 880. When asked whether he believed that "they arrive at the exact same claims that get allowed in the '375, '376 patent after February 28th" with or without the Markman order, Dr. Codd replied "that sounds like monkeys typing on typewriters in alternate rooms arriving at the same novel. There's a possibility. I can't give a probability to it." Daniel Codd Test., ECF No. 415, at 1353-54.

65. The parties vigorously dispute the upshot of the February 21, 2024, communications between Eric Maschoff and Paul Johnson. Dr. Cameron testified that the statement attributed to Eric Maschoff in Paul Johnson's note that it would be "[n]ice to have that at least one mold that together with the compression lug encapsulates the nexus to provide the sealing function," DTX-411, is "really related to how the sealing occurs in the design, which is also – you know, you – you can glean that not from public – public information." Kimberly Cameron Test., ECF No. 414, at 940-41. Dr. Cameron explained:

> So you can see, as I talked about before, the terms that were being used were: Undermold, overmold, primary mold. And now there's a different term that's being used is, which is "mold structure."

> And to me, that trying to imply more than one mold, technically that's reflected in that change in language to the mold structure. And so they're putting mold structure into the patent office, but they're going to imply, just like the alternative designs have, that you're having more than one mold that's doing that.
>
> And so to me, there's a direct technical link between that "trying to imply more than one mold" and that "mold structure" language. And that's informed by my knowledge of what's happening technically in the 1365 investigation.

Id. at 941-42. In Dr. Cameron's big picture view, the changes that were made to the mold term language made it easier to assert these patent claims against Voltage's alternative designs. Id. at 942-44. On cross-examination, Dr. Cameron conceded that the ALJ in the 1365 Investigation raised concerns about the mold terms in the Markman order, but remained steadfast in her view that "there's no indication that that prompted the specific amendments that were made." Id. at 1005.

66. Voltage focuses much of its concern regarding the February 21, 2024, communications around the fact that Paul Johnson added "at least" in front of "partially through" in the February 22, 2024, Supplemental Response to Office Action. See DTX-065. On cross-examination, Dr. Cameron conceded that the "at least partially through" language does not appear in Claim 1 of the '376 Patent. Kimberly Cameron Test., ECF No. 414, at 1022. Those claims were filed on November 29, 2023, months before the February 21, 2024, Eric Maschoff/Paul Johnson conversation. Dr. Cameron agreed that the original claims filed in the '376 patent application also included the "one or more mold structures" language. Id. at 1022-23. Dr. Cameron agreed that dependent claim 6 of the '376 patent limited claim 1 by reciting: "The lead assembly of claim 1, wherein in the region of electrical interconnection, at

least a portion of the first drop line is arranged parallel to at least a portion of the feeder cable." Id. at 1024, see PX-24. Further, Dr. Cameron agreed from review of Figures 35 and 37 of the Shoals patents that "the concept of a single cable making up two drop lines is something that was illustrated in the original figures of the Shoals patent." Kimberly Cameron Test., ECF No. 414, at 1026. Further, Dr. Cameron agreed that the Markman order would put a person of skill in the art on notice "that there's a dispute about second aperture extending partially through." Id. at 1035. Likewise, a person skilled in the art would know that there was a dispute as to whether the claims covered a scenario involving multiple drop lines, which were made up of single cable. Id. at 1037. At the same time, Dr. Cameron reiterated that what Voltage's product looked like was not public information, even after issuance of the Markman order. Id. at 1036.

67.     Dr. Codd agreed that the Markman order reflected a dispute "whether two drop lines could be formed from a single wire or cable." Daniel Codd Test., ECF No. 415, at 1252. Dr. Codd understood the dispute reflected in the Markman order to be "that there was some confusion whether the aperture could cover the single drop line cable embodiment where it essentially terminates at the opposite side of the compression lug." Id. at 1253. The court questioned Dr. Codd about Cameron's conflicting opinion that the information in the public record, including the Markman order, would not inform someone skilled in the art to make the supplemental response to the office action on February 22, 2024, without review of Voltage's confidential alternative designs. Dr. Codd responded:

> Yeah, I'd say it's clear to me in this Markman order excerpt here
> that, you know, the – the issue that you have these dual drop
> embodiments, a person of ordinary skill would see that in
> conjunction with this aperture discussion where they're

29

> construing it to be the entire length throughout that joint, throughout the mold, that they'd be motivated to clarify that, hey, this dual drop line could be made from a singular drop line cable construction to clarify both the drop line confusion as well as the aperture that – you know, that's assigned to that exposed portion of a singular drop line cable for each associated drop line. . . .
> It's also fully supported in the spec, the figures that I kind of peeled the onion layers, back that a person of ordinary skill would see that. And then also reading it in light of the specification with the recommended wire gauges for the drop lines themselves, understanding that those are commonly called "wire" or "cable" for the insulation – insulated wire to construe all those terms together. And I put it to the Shoals' counsel that for efficiency, a drop line cable is kind of the most compact way to describe these parts in this joint assembly.

Id. at 1254. Dr. Codd further testified that the addition of the "at least partially through" language was to sidestep the dispute over where the aperture ended as identified in the Markman order. Id. at 1262. With regard to the February 22, 2024, supplemental response, Dr. Codd testified that "[a] person of ordinary skill would view that in totality, the specification, as originally filed, the publicly available information, and been able to derive the claim amendments as made." Id. at 1272. And he believed that they would have been able to do so without Voltage CBI. Id. Dr. Codd did not believe the February 21, 2024, notes to be based off of any Voltage CBI. Id. at 1273.

68.     As reflected in Dr. Cameron's testimony, Voltage's unclean hands argument is premised on the notion that Paul Johnson's various filings were based on Voltage's CBI, including as to the design of the existing Voltage LYNX product. But there is no dispute that both Shoals and Voltage inserted into the public record at the ITC an x-ray cross-section of the existing Voltage LYNX product, and that this was done in the early pleading stage in the 1365 Investigation, months before Eric Maschoff handed off patent prosecution to Paul

Johnson. See Ex. 50 to Shoal's 1365 Investigation amended complaint, filed July 19, 2023, PX-33, at PX-0033.00004, and Voltage's response to the amended complaint, filed August 8, 2023, PX-36, at PX-0036.00045. See also Kimberly Cameron Test., ECF No. 414, at 1022, 1043-47; Daniel Codd Test., ECF No. 415, at 1211-20. Dr. Codd further testified that it was "completely reasonable" for a person of ordinary skill in the art to see "that a single cable forms two drop lines" from the publicly available Voltage x-ray image and patent figure in Voltage's own patent for its LYNX product, application no. US 2023/0027228, published January 26, 2023. Id. at 1220-22. See PX-418.

69. Thus, although Voltage claimed that the design of its existing LYNX product was CBI, that assertion was not borne out by the evidence as the design of its existing LYNX product was apparent on the public record from the x-ray image submitted to the ITC and Voltage's own patent application. At the bench trial, Voltage focused its claim of misuse of its CBI on alternative designs revealed in discovery in the 1365 Investigation. Voltage did not prove that Eric Maschoff shared CBI as to Voltage's alternative designs with Paul Johnson. At the same time, Voltage's Vice President of Sales and Development testified that Voltage has not sold any alternative design or LYNX PLUS products. Abram Olson Test., ECF No. 411, at 116, 117, 120, 121.

**F.      Eric Maschoff's December 17, 2024, emails to Paul Johnson.**

70. The '375 and '376 patents were issued by the USPTO on June 18, 2024. See PX-24, PX-25.

71. On September 23, 2024, Paul Johnson emailed Eric Maschoff allowed claims documents regarding the '375 and '376 patents. DTX-289. Allowed claims of issued patents is

public information. Eric Maschoff Test., ECF No. 413, at 756. Eric Maschoff testified that while he was not aware of the status of this patent family at that time, he would have assumed that a continuation application would be open. Eric Maschoff Test., ECF No. 413, at 648.

72. On December 17, 2024, Eric Maschoff sent Paul Johnson an email with the subject "Some thoughts on 375." DTX-417. Eric Maschoff attached to his email a chart labeled 375_Patent_Claims.docx. This chart had two columns, one listing the issued claims of the '375 Patent and another headed "Notes." Among other things, in this chart Eric Maschoff suggests new language for claim 1 in which the mold encapsulates the nexus "so as to substantially seal the nexus from environmental conditions." DTX-417, at JOHNSON_MDNC_0000003.

73. Paul Johnson testified that he looked at the chart attached to the Eric Maschoff December 17, 2024, email regarding the '375 Patent "for a couple minutes, closed it, deleted it." Paul Johnson Test., ECF No. 412, at 301.

74. Eight minutes later, Eric Maschoff sent Paul Johnson an email with the subject "Some thoughts on 376." DTX-418. Eric Maschoff attached to his email a chart labeled 376_Patent_Claims.docx with one column listing the claims of the '376 Patent and another column headed "Notes." Paul Johnson testified that he deleted the email from Eric Maschoff concerning the '376 Patent "without opening the attachment." Paul Johnson Test., ECF No. 412, at 301.

75. Paul Johnson testified that he did not discuss the December 17, 2024, emails or the attached charts with Eric Maschoff. Paul Johnson Test., ECF No. 412, at 302.

76. Paul Johnson testified that he "wasn't comfortable receiving these from him," id. at 307, and spoke to the managing partner of Maschoff Brennan about it. Id. at 307-08. Paul

Johnson "decided to do nothing with them and get rid of them." Id. at 308. Paul Johnson testified that the December 2024 materials did not affect any of the language he chose to use in subsequent claims or claim amendments, stating "one of the attachments I didn't even look at. The other attachment, I looked at for one or two minutes before getting rid of it. And I had already – I believe at that point I had already began my review of the final ID and other litigation materials and had already formed my – had begun forming my opinions of what language I wanted to change." Id. at 465.

77. Eric Maschoff testified that "[i]n hindsight, I – I should have been more careful in respect to what I included in that claims chart, that primary purpose being assessment of claim for assertion in a subsequent litigation."[11] Eric Maschoff Test., ECF No. 413, at 630. Eric Maschoff testified that he made a mistake by conflating "litigation effort, which claims should we assert or not assert; I conflated that with my prosecution brain. Which, if you put a claim in front of me, I red-line it; I edit it; I critique it. And that's what I was doing here. That was my thought process." Id. at 642. He explained further:

> So I felt like having a discussion with Paul about what he did or did not do vis-à-vis these claims that might be impactful on whether or not we assert them. I – I feel like that was okay.
>
> What I didn't think through is – and I think some of that information was conveyed in here, hey, Paul – we'd love to talk to you about what you were thinking here and why you did what you did in this patent because it might bear on whether or not we assert that claim or not.
>
> Unfortunately, I didn't take the time to think that also in connection with me thinking out loud about continuations

---

[11] The subsequent litigation about which Eric Maschoff testified took two forms, the 1438 Investigation at the ITC, initiated February 18, 2025, and this lawsuit, filed January 9, 2025.

> and/or what I liked or didn't like about a claim also crossed the
> line with respect to prosecution. I'd made a mistake in that regard.

Id. at 642-43. In any event, Eric Maschoff testified that his notes had nothing to do with Voltage CBI. Id. at 756-58.

78.    Robert Stoll, Voltage's patent procedure expert, testified that Eric Maschoff's December 17, 2024, emails suggesting claims meant that he was substantively involved in the prosecution.  Robert Stoll Test., ECF No. 413, at 814. Stoll deemed it immaterial whether Paul Johnson used the information in the Eric Maschoff December 2024 emails. He testified: "Maschoff sent it to him. So Maschoff is including himself and directing prosecution. It doesn't even matter whether Johnson took all of those amendments and put [them] in. Maschoff is inserting himself in the prosecution process." Id. at 815.

79.    Paul Johnson's billing records for December 17, 2024, reflect 5.4 hours billed for "Begin review of briefings in ITC case for '254 and '153 patents to inform prosecution of continuation application." DTX-168, at SHOALS00090144; Paul Johnson Test., ECF No. 412, at 300.

80.    On January 14, 2025, Paul Johnson filed a preliminary amendment to the '127 patent application.  This amendment did not contain the "substantially seal" language reflected in Eric Maschoff's notes. Daniel Codd Test., ECF No. 415, at 1246.

81.    On January 15, 2025, Paul Johnson filed the '810 patent application. This application did not contain the "substantially seal" language in claim 1 or the other independent claims of the '810 patent application. Id. at 1248.

82.    Between December 17, 2024, and January 15, 2025, Paul Johnson billed 9.3 hours. His billing entry of 7.3 hours on January 7, 2025, states: "Finish review of briefings in ITC case

for '254 and '153 patents to inform prosecution of continuation application; Prepare preliminary amendment in continuation application based on issues raised in ITC case; Review granted claims in related '375 and '376 patents in view of ITC issues and prepare revised claims for potential new continuation application." DTX-169, at SHOALS00090180.

83.	Dr. Cameron testified that Eric Maschoff's notes about the issued claims in the '376 Patent questioned the use of the term "conforming," and that the word "conforming" was changed to "enclosing" in subsequent amendments to application no. '127. Kimberly Cameron Test., ECF No. 414, at 945-948. At the same time, she agreed that many of the edits contained in Eric Maschoff's December 17, 2024, charts were never made by Paul Johnson. Id. at 1050-56. On re-direct, Dr. Cameron pointed out other similarities between Eric Maschoff's charts and subsequent prosecution of the '295 Patent. Id. at 1087-96. Dr. Cameron's testimony reflected much back and forth on this issue. See id. at 1128-33, 1144-72. Dr. Codd also testified that the ALJ's Final Initial Determination in the 1365 Investigation issued on September 17, 2024, "clearly states that there's an argument about the 'fully encase' or 'substantially seal' clauses. So the amendments -- a person of ordinary skill would understand to simply delete that phrase in contention to simplify the claim." Daniel Codd Test., ECF No. 415, at 1241.

84.	The court finds Paul Johnson's testimony credible that he only briefly looked at Eric Maschoff's December 17, 2024, email concerning the allowed claims in the '375 Patent and did not open the email attachment regarding the allowed claims in the '376 Patent. The court finds as a matter of fact that Voltage did not establish that Paul Johnson made any use of Eric

Maschoff's December 17, 2024, emails and attached charts regarding the allowed claims in the '375 and '376 Patents.

85.     On March 21, 2025, Paul Johnson filed application no. 19/086,937, which issued as the '295 Patent on September 2, 2025. That application does not contain the "substantially seal" language.  Daniel Codd Test., ECF No. 415, at 1245, 1249.  Dr. Codd testified that this was consistent with the 1365 Investigation Final Initial Determination. "So the 1365 final initial determination again states that the alternative design does not fully encase or substantially seal the nexus.  So this addition to the '295 – or this claim on the '295 patent application to enclose at least a portion of the nexus is consistent with that." Id. at 1249. Dr. Codd testified that as highlighted in the final initial determination, the inner mold of the alternative designs did not fully encase, or substantially seal, the nexus.  And to get around that problem in the new '295 patent application, a person of ordinary skill in the art would want to amend the claims to take out that substantially seal language. And according to Dr. Codd, that could be determined from the public record without knowledge of Voltage CBI in the alternative designs. Id. at 1249-50. In sum, Dr. Codd testified that he did not see any Voltage CBI that would have been used in order to make the amendments in the claims. Id. at 1251.

<b>CONCLUSIONS OF LAW</b>

1.     Voltage argues that these facts support a finding of inequitable conduct and unclean hands and seeks a ruling that the '375, '376, and '295 patents are unenforceable. These defenses, although equitable cousins, are different.[12]

---

[12] "Indeed, what we have termed 'inequitable conduct' is no more than the unclean hands doctrine applied to particular conduct before the PTO." Consol. Aluminum Corp. v. Foseco Int'l Ltd., 910 F.2d 804, 812 (Fed. Cir. 1990).

2. "Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent." Therasense, Inc. v. Becton, Dickinson & Co., 649 F.3d 1276, 1285 (Fed. Cir. 2011).

> To prevail on the defense of inequitable conduct, the accused infringer must prove that the applicant misrepresented or omitted material information with the specific intent to deceive the PTO. The accused infringer must prove both elements— intent and materiality—by clear and convincing evidence. If the accused infringer meets its burden, then the district court must weigh the equities to determine whether the applicant's conduct before the PTO warrants rendering the entire patent unenforceable.

Id. at 1287.

> [As such,] the remedy for inequitable conduct is the 'atomic bomb' of patent law. Unlike validity defenses, which are claim specific, inequitable conduct regarding any single claim renders the entire patent unenforceable. Unlike other deficiencies, inequitable conduct cannot be cured by reissue or reexamination. Moreover, the taint of a finding of inequitable conduct can spread from a single patent to render unenforceable other related patents and applications in the same technology family.

Id. at 1288. (cleaned up).[13]

3. Voltage presented no evidence that Shoals or its patent counsel acted with the specific intent to deceive the USPTO. Thus, the defense of inequitable conduct fails. As there has been no showing that the patents in suit were issued as a result of fraud on the PTO, the court

---

[13] The Therasense court bemoaned the ubiquity of charges of inequitable conduct. "With these far-reaching consequences, it is no wonder that charging inequitable conduct has become a common litigation tactic. . . . Inequitable conduct 'has been overplayed, is appearing in nearly every patent suit, and is cluttering up the patent system.' Kimberly-Clark Corp. v. Johnson & Johnson, 745 F.2d 1437, 1454 (Fed. Cir. 1984). '[T]he habit of charging inequitable conduct in almost every major patent case has become an absolute plague. Reputable lawyers seem to feel compelled to make the charge against other reputable lawyers on the slenderest grounds, to represent their client's interests adequately, perhaps.' Burlington Indus., Inc. v. Dayco Corp., 849 F.2d 1418, 1422 (Fed. Cir. 1988)." Therasense, 649 F.3d at 1289.

will not entertain the potent remedy sought by Voltage of declaring the patents unenforceable due to inequitable conduct at the USPTO.

4. The court must next consider the unclean hands defense asserted by Voltage in this lawsuit.

5. It is well established that "[h]e who comes into equity must come with clean hands." Keystone Driller Co. v. Gen. Excavator Co., 290 U.S. 240, 241 (1933). Courts of equity

> apply the maxim requiring clean hands only when some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation. They do not close their doors because of plaintiff's misconduct, whatever its character, that has no relation to anything involved in the suit, but only for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication.

Id. at 245.

6. "The doctrine of unclean hands is an equitable defense to enforcement of a claim, including the enforcement of a patent infringement claim for which the plaintiff seeks, among other things, monetary damages." Staton Techiya, LLC v. Samsung Elecs. Co., Ltd., 742 F. Supp. 3d 602, 646 (E.D. Tex. 2004).

7. The doctrine of unclean hands "'closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant,' and requires that claimants 'have acted fairly and without fraud or deceit as to the controversy in issue.'" Gilead Scis., Inc. v. Merck & Co., Inc., 888 F.3d 1231, 1239 (Fed. Cir. 2018) (quoting Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 814-15 (1945)).

38

8. The unclean hands doctrine applies to "pre-litigation business misconduct and litigation misconduct" that "normally would enhance the claimant's position regarding legal rights that are important to the litigation if the impropriety is not discovered and corrected." Gilead, 888 F. 3d at 1239-40; see Keystone Driller, 290 U.S. at 243. It does not matter whether the misconduct actually "affect[ed] the litigation," so long as it had "objective potential to have done so." Gilead, 888 F.3d at 1240.

9. The unclean hands doctrine is especially applicable in patent cases because of the public interest involved in patents. The Supreme Court has stated that the unclean hands doctrine "assumes even wider and more significant proportions" in cases "where a suit in equity concerns the public interest as well as the private interests of the litigants." Precision, 324 U.S. at 815. This is because applying the unclean hands doctrine "to withhold its assistance in such a case . . . not only prevents a wrongdoer from enjoying the fruits of his transgressions but averts injury to the public." Id. As the Court noted, "[t]he far-reaching social and economic consequences of a patent, therefore, give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such monopolies are kept within their legitimate scope." Id. at 816.

10. Voltage bears the burden of proving by clear and convincing evidence that Shoals acted with unclean hands. In re Omeprazole Patent Litig., 483 F.3d 1364, 1374 (Fed. Cir. 2007). However, courts are not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion to deny relief to claimants whose hands are unclean. Keystone Driller, 290 U.S. at 245. "This maxim necessarily gives wide range to the

39

equity court's use of discretion in refusing to aid the unclean litigant." Precision, 324 U.S. at 815.

11.     Voltage did not prove, by clear and convincing evidence, that Eric Maschoff shared any Voltage CBI with Paul Johnson.

12.     Voltage did not prove, by clear and convincing evidence, that any of the patent prosecution filings by Paul Johnson related to the '375, '376, or '295 patents resulted from any use of Voltage CBI.

13.     As such, this case differs from other decisions in which patents were held to be unenforceable due to compromise of CBI.  For example, in Staton Techiya, LLC v. Samsung Electronics Co., Ltd., 742 F. Supp. 3d 602, 610 (E.D. Tex. 2004), the court concluded that "[t]he clear and convincing weight of the evidence shows that the patent claims underlying this litigation are infected by the theft of Samsung's confidential and attorney-client privileged information."  The Staton Techiya court concluded: "The level of misconduct that occurred here—including stealing the opponent's privileged and confidential analysis of the patents-in-suit both before and during the litigation—exceeds the misconduct that warranted application of the unclean hands doctrine in Supreme Court and Federal Circuit precedent." Id. at 658 (citing Keystone Driller, Precision, and Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238 (1944)).

14.     Lacking any clear and convincing evidence that Shoals used any Voltage CBI gleaned from the 1365 Investigation in the prosecution of the '375, '376, and '295 patents, Voltage argues for unclean hands based on Eric Maschoff's communications with Paul Johnson after Voltage and Shoals agreed to the Prosecution Bar Stipulation on September 20, 2023.

40

15. The Prosecution Bar Stipulation entered into by the parties is broadly worded, "institut[ing] an ethical wall prohibiting the involvement of all attorneys who have access to Voltage's confidential information disclosed in this Investigation from the prosecution of the continuation application, 18/341,655, and any subsequent related applications." DTX-218.

16. The Federal Circuit addressed patent prosecution bars in In re Deutsche Bank Trust Co. Americas, 605 F.3d 1373 (Fed. Cir. 2010). As the Federal Circuit explained, a prosecution bar stems from a concern over inadvertent disclosure of confidential information in patent infringement cases when trial counsel also represent the same client in prosecuting patent applications before the PTO. Id. at 1379. Noting that patent prosecution "is not a one-dimensional endeavor," id., the Federal Circuit outlined the circumstances in which attorneys involved in litigation are more substantially engaged with prosecution.

> Such involvement may include obtaining disclosure materials for new inventions and inventions under development, investigating prior art relating to those inventions, making strategic decisions on the type and scope of patent protection that might be available or worth pursuing for such inventions, writing, reviewing, or approving new applications or continuations-in-part of applications to cover those inventions, or strategically amending or surrendering claim scope during prosecution.

Id. at 1380. The court concluded:

> We therefore hold that party seeking imposition of a patent prosecution bar must show that the information designated to trigger the bar, the scope of the activities prohibited by the bar, the duration of the bar, and the subject matter covered by the bar reasonably reflect the risk presented by the disclosure of proprietary competitive information.

Id. at 1381. The court therefore starts with the premise derived from <u>Deutsche Bank</u>, that prosecution bar stipulations exist to protect the disclosure of proprietary competitive information—CBI.

17. This premise is also consistent with the facts of this case, as the Prosecution Bar Stipulation arose from Voltage's concerns over Eric Maschoff's access to Voltage's CBI. When first raised by counsel for Voltage in its email of August 16, 2023, the concern raised was access to Voltage's CBI. "We understand that [Shoal's] prosecution counsel is a partner in your Firm and you have indicated that you believe that your prosecution partner should be able to have access to Voltage's CBI. We are concerned that such disclosure could lead to the use of Voltage's CBI to draft patent claims, which would not be a use 'solely for purposes of this investigation.'" DTX-177, at VOLTAGE_00036622.

18. Voltage's claim of unclean hands centers around three sets of claim language in the Shoals patents: "mold," "drop line cable," and "extending at least partially through."

19. As regards the mold terms, Voltage has not proven, by clear and convincing evidence, that the November 10, 2023, amendments to replace "undermold" with "mold" in claim 1 of the '375 patent, and the use of "one or more mold structures" in the November 29, 2023, '376 patent application, stemmed from any improper disclosure or use of Voltage CBI by the Maschoff Brennan law firm. At most, the October, 2023, communications between Eric Maschoff and Paul Johnson pointed Paul Johnson in the direction of the publicly available documents related to disputed mold terms in the 1365 Investigation. The court concludes that it was Paul Johnson's detailed review of those documents, rather than his fleeting communications with Eric Maschoff, that resulted in the difference in the mold terms reflected

42

in the November 10, 2023, preliminary amendment to the '375 patent application (application no. 18/341,655) and the November 29, 2023, '376 patent application (application no. 18/523,464).

20.     As regards the November 10, 2023, preliminary amendment to application no. 18/341,655 and the filing on November 29, 2023, of application no. 18/523,464, Voltage offers only conjecture that these filings came from use of its CBI. In this regard, the testimony of Dr. Cameron and Robert Stoll falls far short of the clear and convincing standard required to establish unclean hands.

21.     Further, certain portions of Paul Johnson's notes of his February 21, 2024, conversation with Eric Maschoff mention the mold terms. Those portions of the notes, highlighted in red, state "[n]ice to have that at least one mold that together with the compression lug encapsulates the nexus to provide the sealing function," and "Eric would love to say at least one mold that surrounds the compression lug and the nexus so as to provide a sealing effect of the nexus," "[t]rying to imply that more than one mold," and "We want a primary mold that does not necessarily." DTX-411. The court credits Paul Johnson's testimony that while he spoke with Eric Maschoff for ten to fifteen minutes on February 21, 2024, he spent the remainder of the 6.9 hours he billed that day on a detailed review of the February 20, 2024, Markman order. On its face, the Markman order noted the ongoing dispute regarding the mold terms, stating "[t]his Order does not address whether there could be some partial molding material, which does not fully encase the nexus so as to substantially seal it from external environmental conditions, underneath the 'primary mold.'" PX-13, at PX-0013.000037 n.31. Again, while Eric Maschoff's communications with Paul Johnson alerted

43

Paul Johnson to the <u>Markman</u> order issued in the 1365 Investigation the day before, the court cannot conclude that flagging the existence of the publicly available <u>Markman</u> order constitutes unclean hands rendering the patents at suit unenforceable.

22.    Nor can the court conclude that Eric Maschoff's February 21, 2024, conversation with Paul Johnson reflected any Voltage CBI regarding its alternative designs gleaned from Eric Maschoff's earlier deposition of Voltage's expert Dr. Kenny. Eric Maschoff's deposition questions to Dr. Kenny on the issue of alternative designs were cursory and only concerned whether Dr. Kenny was aware as to whether Voltage had tested any of these designs. Nothing in the February 21, 2024, notes or otherwise suggests that Eric Maschoff shared any Voltage CBI regarding its alternative designs with Paul Johnson.

23.    The court also concludes that Voltage did not establish, by clear and convincing evidence, that Shoals engaged in unclean hands with regard to the February 22, 2024, claim amendment regarding drop line cable and drop line cable pathway. As the USPTO itself later noted in an Office Action dated March 13, 2025, "[t]he concept of a drop line cable comprising more than one drop line seems to be best illustrated in Fig. 35 of the instant drawings." PX-353, at PX-0353.000157. Dr. Codd testified consistently that Figures 35 and 37 are "dual-drop embodiment figures." Daniel Codd  Test., ECF No. 415, at 1209. Dr. Codd testified that a person of ordinary skill in the art seeing the Voltage x-ray and patent figures would have no doubt "that a single cable forms two drop lines." <u>Id.</u> at 1222. Further, footnote 34 of the February 20, 2024, <u>Markman</u> order highlighted the ongoing dispute raised by Voltage as to whether the patents at issue in that investigation covered "two different drop lines using a single cable," stating as follows:

> Respondents raised various issues at the hearing relating to, <u>e.g.</u>, the possibility of changes in the diameter of an aperture, two drop lines forming a single cable, or pathways that bend. Given the current state of the record, the undersigned does not find that the issues show clearly and convincingly that the claim is indefinite. This issue may be revisited after the evidentiary hearing.

February 20, 2024, <u>Markman</u> Order, PX-13, at PX-0013.000041 n.34 (internal citation omitted). Again, while Eric Maschoff's communications with Paul Johnson alerted Paul Johnson to the <u>Markman</u> order issued in the 1365 Investigation the day before, the court cannot conclude that flagging the existence of the publicly available <u>Markman</u> order constitutes unclean hands.

24.     The court concludes the same as regards Paul Johnson's addition of the "at least partially through" language in the February 22, 2024, amendment. The February 20, 2024, <u>Markman</u> order again flagged a concern about this claim language. The <u>Markman</u> order stated: "[t]he dispute as to 'extending partially,' as presented at the <u>Markman</u> hearing, appears to concern how to determine where drop line apertures ('second' or 'third' apertures) terminate. This may be relevant to scenarios involving multiple drop lines, which may apparently be comprised of a single cable." <u>Markman</u> Order, PX-13, at PX-0013.000049. There is no dispute that the February 20, 2024, <u>Markman</u> order was a public document that Paul Johnson spent hours reviewing. Voltage argues for a finding of unclean hands based on Eric Maschoff's alerting Paul Johnson to the <u>Markman</u> order on February 21, 2024, and their brief conversation. Given that there was no evidence that Eric Maschoff provided Paul Johnson with any Voltage CBI and that, following his brief conversation with Eric Maschoff, Paul Johnson proceeded to undertake a detailed review of the <u>Markman</u> order resulting in his

February 22, 2024, supplemental response, the court cannot conclude that unclean hands has been proven by clear and convincing evidence rendering the patents in suit unenforceable.

25.     The court credits Paul Johnson's testimony that he made no use of Eric Maschoff's December 17, 2024, emails containing charts of the allowed claims in the '375 and '376 patents. Voltage has not proven, by clear and convincing evidence, that these emails constitute unclean hands rendering the patents in suit unenforceable.

26.     The parties disagree as to whether the facts of this case resemble the circumstances facing the Federal Circuit in Gilead Sciences, Inc. v. Merck & Co., Inc., 888 F.3d 1231 (Fed. Cir. 2018). Gilead concerned two patents owned by Merck relating to treatment for Hepatitis C. Gilead brought a declaratory judgment action against Merck that its Hepatitis C treatment did not infringe Merck's patents and that those patents were invalid.  Following a jury trial, Merck was awarded damages for infringement. Thereafter, the court held a bench trial on Gilead's equitable defenses, including the allegation that Merck had unclean hands regarding the patents. The district court ruled for Gilead, finding both pre-litigation business misconduct and litigation misconduct attributable to Merck, and barred Merck from asserting the patents against Gilead. On appeal, the Federal Circuit affirmed, concluding that the findings of unclean hands were sufficiently supported. The Federal Circuit summarized the findings of pre-litigation misconduct in Gilead as follows:

> The district court found, with adequate evidentiary support, two related forms of pre-litigation business misconduct attributable to Merck.  First, Dr. Durette learned of Pharmasset's PSI-6130 structure by participating, at Merck's behest, in a conference call with Pharmasset representatives, violating a clear "firewall" understanding between Pharmasset and Merck that call participants not be involved in related Merck patent prosecutions. Second, Merck continued to use Dr. Durette in the

46

related patent prosecutions even after the call. The district court also found, with adequate evidentiary support, a direct connection to the ultimate patent litigation involving sofosbuvir. Thus, Dr. Durette's knowledge of PSI-6130, acquired improperly, influenced Merck's filing of narrowed claims, a filing that held the potential for expediting patent issuance and for lowering certain invalidity risks. Those findings establish serious misconduct, violating clear standards of probity in the circumstances, that led to the acquisition of the less risky '499 patent and, thus, was immediately and necessarily related to the equity of giving Merck the relief of patent enforcement it seeks in this litigation.

Id. at 1240-41.

27. The facts concerning the pre-litigation misconduct in Gilead bear further discussion. Pharmasset provided information about its nucleoside compound, PSI-6130, to Merck under a firewall agreement separating Merck scientists learning about the Pharmasset product from Merck scientists working on patenting Merck's own Hepatitis C program. During a March 17, 2004 call, "before disclosing the compound's structure, Pharmasset confirmed the importance of the firewall to it by asking whether the two participating Merck employees (Dr. Durette and Dr. Pon) were within the firewall separating Merck call participants from related Merck HCV patenting efforts." Id. at 1241-42. During the March 17, 2004, call, the PSI-6130 structure was disclosed. And although thereafter Dr. Durette no longer participated in the work of the Merck team dealing with Pharmasset, "Merck kept him working as the prosecuting attorney for its patent applications related to nucleosides that inhibit Hepatitis C virus replication." Id. at 1242. The Federal Circuit concluded:

Those facts support the district court's findings of serious business misconduct. Merck sent Dr. Durette to participate in the March 2004 call despite the clear firewall and the fact that "Merck . . . knew that Pharmasset's compound was an NS5B polymerase inhibitor just like its own compounds from the Merck-Isis

47

collaboration. Dr. Durette's involvement with Merck's HCV patents violated the understanding the parties had about their firewall obligations, which excluded anyone involved with Merck's internal HCV program." And after the call, it was "wrong for Merck to allow Dr. Durette to continue to prosecute" the Merck applications: he continued prosecution of the application that became the '499 patent, and in 2007 he filed (and immediately amended) the application that became the '712 patent.

Id. (internal citations to district court opinion omitted).

The Federal Circuit next found that Dr. Durette's participation in the March 17, 2004, call was connected to the patent litigation between Merck and Gilead.

> [I]n February 2005, a month after the publication of Pharmasset's Clark Application, Dr. Durette amended the Merck application that ultimately issued as the '499 patent by canceling the broad genus claims and substituting claims that narrowed the scope to a subgenus focused on the key features of PSI-6130. The district court found that "Dr. Durette would not have written new claims to cover PSI-6130 in February 2005 but for his improper participation on the March 17, 2004 patent due diligence call and learning of the structure of PSI-6130 ahead of the structure being published."
>
> Given that Dr. Durette learned of the PSI-6130 structure in March 2004 (as is now conceded), the district court could readily find that his knowledge from the call played a significant role in his actual process of decision-making that led him to file claims focusing on that and similar structures. . . .
>
> Although Merck stresses that even the pre-February 2005 claims *included* PSI-6130 and similar structures, Dr. Durette explained the benefits to a patentee's legal position from a narrowing amendment of this sort. "It would expedite prosecution." . . .
>
> In these circumstances, we see no error in the district court's determination that the pre-litigation business misconduct we have summarized was immediately and necessarily related to the equity of Merck's obtaining enforcement of its patent in this litigation.

48

Id. at 1242-43 (internal citations omitted).

28.    The facts of Gilead bear certain similarities and differences from this case. First, the firewall agreed to by Pharmasset and Merck resembles the Prosecution Bar Stipulation in this case. However, unlike Dr. Durette, who continued to personally prosecute Merck's Hepatitis C patent applications despite learning of the structure of the PSI-6130 under the firewall agreement, Eric Maschoff transferred prosecution of the Shoals patent family to Paul Johnson before the Prosecution Bar Stipulation was filed with the ITC on September 20, 2023. But as the evidence revealed, Eric Maschoff did not completely divorce himself from Shoals's patent prosecution by communicating with Paul Johnson in October 2023, February 2024, and December 2024.  And while Dr. Durette personally knew of the structure of PSI-6130 when he later filed the amendment to the Merck application, there was no evidence that Eric Maschoff ever communicated any Voltage CBI to Paul Johnson. Accordingly, while the breach of the firewall agreement in Gilead was clear, the evidence in this case is more attenuated.

29.    Rather than communicate Voltage CBI to Paul Johnson, Eric Maschoff's communications can best be characterized as (1) a "heads up" as to developments on the public docket in the 1365 Investigation; and (2) suggestions for patent prosecution actions based on filings on that public docket.

30.    The October 2023 emails between Eric Maschoff and Paul Johnson fall in the first category, with Eric Maschoff telling Paul Johnson that there is "a lot of new art that we'll need to cite in connection with the pending application (you might also want to review the invalidity contentions to inform possible claim amendments)." DTX-472, and "They've made some indefiniteness arguments to think about as well that we should consider in connection with

any supplemental claims. Note that none of this involves CBI, so some of this I am free to talk about." DTX-473. Given the undisputed evidence that Paul Johnson worked for many hours in early November 2023 reviewing the prior art, prosecution histories of ancestor applications, and publicly available ITC documents, without any other involvement of Eric Maschoff, prior to filing the preliminary amendment to Application No. 18/341,655 on November 10, 2023, (which issued as the '375 patent), and Application No. 18/523,464 on November 29, 2023, (which issued as the '376 patent), the facts of this case are starkly different from that of <u>Gilead</u>. There simply is no comparison between Dr. Durette's continued prosecution activities on behalf of Merck despite the firewall and the limited "heads up" emails by Eric Maschoff in October 2023.

31. The Federal Circuit in <u>Gilead</u> also found a direct causal link between Merck's breach of the firewall agreement and Dr. Durette's February 2005 patent application amendment. The record in this case is not as clear as to causation. While Eric Maschoff's October 2023 emails contained certain suggestions, those emails were followed by Paul Johnson's detailed perusal of the public filings in the 1365 ITC Investigation. The causal link present in <u>Gilead</u> is not reflected in the October 2023 Eric Maschoff emails.

32. The February 21, 2024, email from Eric Maschoff forwarding Paul Johnson the <u>Markman</u> order and asking him to "take a look at it in connection with our pending claims" is likewise a "heads up" as to the issuance of the <u>Markman</u> Order in the 1365 ITC Investigation. Just as with the October 2023 emails, the court does not believe that apprising Paul Johnson of public filings in the 1365 Investigation constitutes unclean hands rendering the patents in suit unenforceable.

50

33. But their subsequent email string and conversation on that date, testified to by Paul Johnson and reflected in his notes, goes beyond a mere notification of the <u>Markman</u> order and involved substantive discussions of claim terms and a "new claim directed to Figs. 35, 37 where a single drop-line cable passes through mold via single pathway but forms two drop lines." DTX-411. The emails and notes reflect suggestions made by Eric Maschoff for Paul Johnson to consider as claim amendments. Eric Maschoff Test., ECF No. 412, at 531. Taking note of Eric Maschoff's suggestions, Paul Johnson spent the bulk of the 6.9 hours he billed that day analyzing the <u>Markman</u> order and conducting his own independent analysis of what additional amendments to make. Paul Johnson Test., ECF No. 412, at 216. Paul Johnson's credible testimony that the February 22, 2024, claim amendments stemmed from his own independent analysis, as corroborated by the amount of time he billed that day, distinguishes the facts of this case from the circumstances in <u>Gilead</u>, where Dr. Durette proposed the February 2005 claim amendments in violation of Merck's firewall with Pharmasset. Considering the credibility of the witnesses in this case, the court cannot conclude that Voltage has established, by clear and convincing evidence, that the supplemental response filed by Paul Johnson on February 22, 2024, was the result of unclean hands sufficient to render the '375 patent unenforceable.[14]

34. Nor can the court conclude that Eric Maschoff's emailing of claim charts regarding the issued '375 and '376 patents to Paul Johnson in December 2024 constitutes unclean hands

---

[14] At the same time, the court finds that Eric Maschoff's conduct on February 21, 2024, violated the broad scope of the Prosecution Bar Stipulation and "accelerated the prosecution of these claims." Paul Johnson Test., ECF No. 412, at 225. While not rising to the level of unclean hands rendering the Shoals patents in suit unenforceable against Voltage, should this case result in a damage award for Shoals, equity requires that this acceleration be taken into account by the court in fashioning the amount of damages to be awarded, by remittitur, or otherwise within the court's equitable power.

rendering the Shoals patents in suit unenforceable. On December 17, 2024, Eric Maschoff sent Paul Johnson two emails with attachments, one entitled "Some thoughts on 375," and the other "Some thoughts on 376." Paul Johnson testified that he looked at the chart attached to the Eric Maschoff email regarding the '375 Patent "for a couple minutes, closed it, deleted it. And then I deleted the other e-mail without opening the attachment." Paul Johnson Test., ECF No. 412, at 301. The court found Paul Johnson's testimony credible. As there was no clear and convincing evidence that Paul Johnson used the December 17, 2024, emails in prosecuting the '295 Patent, there can be no finding of unclean hands based on these emails.

35. Voltage argues that its burden of proving unclean hands by clear and convincing evidence is met by the fact that Eric Maschoff reached out to Paul Johnson on three separate occasions after the Prosecution Bar Stipulation was entered: October 2023, February 2024, and December 2024. As noted, neither the October 2023 nor December 2024 sets of emails support the equitable remedy sought by Voltage of nonenforcement of the '375, '376, and '295 patents. And while the February 21, 2024, claim amendment suggestions made by Eric Maschoff are more troubling and violate the broad scope of the Prosecution Bar Stipulation, Voltage has not established that those suggestions stem from Voltage CBI, as opposed to the publicly available Markman order. As such, Voltage has not met its burden of proof, by clear and convincing evidence, that the equitable remedy of nonenforcement is appropriate in this case. As noted, should damages be awarded in this case, the court will fashion an appropriate remedy to account for the acceleration of the prosecution of the '375 and '376 patents as a result of Eric Maschoff's February 21, 2024, emails and conversation with Paul Johnson.

52

36.     There is one additional significant difference between the facts in <u>Gilead</u> and here. As both the district court and Federal Circuit opinions reflected in <u>Gilead</u>, the pre-litigation business misconduct was compounded by findings that Dr. Durette testified falsely in his deposition and at trial regarding his participation in the March 2004 call with Pharmasset and the role the January 2005 Clark Application played in the filing of Merck's February 2005 amendment. The district court found this testimony "so incredible as to be intentionally false. The intentional testimonial falsehoods qualify as the kind of misconduct that can, in these circumstances, support a determination of unclean hands." <u>Gilead</u>, 888 F.3d at 1244. Nothing of the sort happened in this case.

37.     The evidence establishes that Eric Maschoff's communications on February 21, 2024, violated the Prosecution Bar Stipulation in this case.  The case of <u>Global Tubing, LLC v. Tenaris Coiled Tubes, LLC</u>, 621 F. Supp. 3d 757 (S.D. Tex. 2002), is instructive.  In <u>Global Tubing</u>, a patent infringement case, the protective order entered by the district court included a patent prosecution bar stating that litigation counsel "who reviews or otherwise learns" of technical confidential information regarding coiled steel "shall not prepare, prosecute, supervise, or assist in the preparation or prosecution of any patent application pertaining to coiled steel tubing." <u>Id.</u> at 761.  Following <u>Deutsche Bank</u>, the court noted the purpose of prosecution bars.

> In the context of patent cases, prosecution bars are designed to address the issue that "it is very difficult for the human mind to compartmentalize and selectively suppress information once learned, no matter how well-intentioned the effort may be to do so. [<u>Deutsche Bank</u>, 605 F.3d at 1378] (quoting <u>FTC v. Exxon Corp.</u>, 636 F.2d 1336, 1350 (D.C. Cir. 1980)); <u>see Ultra Premium Servs., LLC v. OFC Int'l, LLC</u>, No. 4:19-CV-2277, 2019 WL 5846900 at *1 (S.D. Tex. Nov. 7, 2019) ("Inclusion of a

prosecution bar in a protective order may be necessary when 'even the most rigorous efforts of the recipient of [confidential] information to preserve confidentiality . . . may not prevent inadvertent compromise." (quoting <u>Deutsche Bank</u>, 605 F.3d at 1378)).

621 F. Supp. at 762.

Plaintiff Global Tubing alleged that the Tenaris defendants' litigation counsel Jayme Partridge assisted patent prosecutors with prosecuting patents for children of the main patent at suit. The court in <u>Global Tubing</u> highlighted the concern in that case, and here, where the same law firm represents a party as both litigation counsel and patent prosecutors.

> The Federal Circuit in <u>Deutsche Bank</u> recognized that the concern underlying prosecution bars manifests itself when trial counsel also represents its client in prosecuting patent applications before the PTO. In this circumstance, it is difficult for a court to conclude that a trial attorney who subsequently assists with patent prosecution was able to strictly exclude any information he or she learned regarding the opposing party's confidential information through discovery during the prosecution of the client's patents. Based on the broad nature of the prosecution bar here—barring litigation counsel from assisting in the preparation or prosecution of "any patent application pertaining to coiled steel tubing or methods of heat treating coiled steel tubing"—it appears that the parties specifically considered compartmentalization of information once learned difficult, if not impossible.

<u>Id.</u> at 763. The <u>Global Tubing</u> court found "that the express terms of the prosecution bar prohibited litigation counsel from assisting in any patent prosecution activities related to coiled steel tubing." <u>Id.</u>

The issue in <u>Global Tubing</u> concerned selective disclosure of prior art to the PTO gleaned from the patent litigation. Global Tubing alleged that defense litigation counsel Partridge helped coordinate the partial disclosure of prior art to the PTO to get stronger claims

54

asserted in the children patents. The Tenaris defendants countered that there could be no violation of the prosecution bar since Partridge never shared plaintiff's confidential information with prosecution counsel and Partridge's involvement in the decision of how to disclose the prior art documents to the PTO does not amount to assistance with patent prosecution.

The Global Tubing court found that the prosecution bar was violated and awarded sanctions. The court dismissed the argument that there was no proof that confidential information had been disclosed, concluding as follows:

> Nevertheless, Partridge declares that she did not use any knowledge of Plaintiff's confidential information when agreeing with the prosecutors' strategy. Although the prosecution bar does not require there to have been a breach of confidentiality, since it is difficult for the human mind to compartmentalize and selectively suppress information once learned, the Court cannot conclude that counsel was necessarily able to exclude all information she learned regarding Plaintiff's confidential information through discovery during the [prior art] disclosure discussions or when she expressed her agreement with the prosecutors' strategy. See Par Sys. [Inc. v. iPhoton Sols, LLC, No. 4:10-CV-393-Y, 2012 WL 12885085 (N.D. Tex. Apr. 17, 2012)], at *3 (finding that defendants' unintentional violations of prosecution bar do not lead to the conclusion that counsel was able to strictly exclude any information he learned during discovery as litigation counsel from his actions in prosecuting patent applications); see also Silicon Graphics, Inc., v. ATI Techs., Inc., No. 06-C-611-C, 2007 WL 5433478, at *3 (W.D. Wis. Aug. 8, 2007) ("To give effect to [the prosecution bar], . . . the legal teams of both parties must wall themselves off from their clients to prevent the dissemination of legal advice on other matters that might be tainted by information gleaned from reviewing the opposing party's confidential information.").

Id. at 765-66. Finding a violation of the prosecution bar, the magistrate judge in Global Tubing awarded reasonable expenses, including attorneys' fees, in an amount to be determined at the conclusion of the case. Id. at 766.

38.     Shoals asserts that dismissal of this action or a declaration that the patents in suit are unenforceable based on the breach of the Prosecution Bar Stipulation would be a case of first impression. See Eolas Tech. Inc. v. Amazon.com, Inc., No. 17-cv-03022-JST, at *7(N.D. Cal. Dec. 9, 2019) ("The Defendants do not cite, and the Court has not been able to locate, any case dismissing a patent plaintiff's complaint because of a violation of the patent prosecution bar.").

39.     The court agrees that the circumstances of this case do not warrant dismissal of this action or a declaration that the patents in suit are unenforceable. Rather, the court will take into account the acceleration in the prosecution of the '375 and '376 patents occasioned by Eric Maschoff's quick email and suggestions to Paul Johnson on February 21, 2024, in violation of the Prosecution Bar Stipulation in adjusting the amount of damages to be awarded should this case result in a damages award.

40.     Voltage's request to render the claims of the Shoals patents unenforceable falls flat for another reason.  Throughout the bench trial, the focus of Voltage's claim of misuse of its CBI from the 1365 Investigation revolved around the alternative designs revealed in discovery. Voltage has not established by clear and convincing evidence that Eric Maschoff shared Voltage CBI regarding its alternative designs with Paul Johnson.  Beyond that, the infringement allegations in this case do not involve Voltage's alternative designs, as it was undisputed at trial that Voltage has not made any products using the alternative designs. The

infringement allegations in this case concern the existing Voltage LYNX product. For the purposes of this case, there is no equitable reason to limit enforcement of Shoals's patents against the existing Voltage LYNX product simply because Eric Maschoff had access during the 1365 ITC Investigation to Voltage alternative design information about products Voltage has yet to manufacture and which are not at issue in this case.

41. Shoals asks the court to adopt the conclusion of the Administrative Law Judge in the 1438 Investigation that Voltage did not prove that Shoals engaged in unclean hands. While the court is mindful of the excellent legal analysis done by the ITC Administrative Law Judge on the issue of unclean hands in the 1438 Investigation, in patent cases, "ITC decisions are not binding on district courts in subsequent cases brought before them," and "accused infringers can raise whatever defenses they believe are justified, regardless whether they previously raised them and lost in the ITC. The district court can attribute whatever persuasive value to the prior ITC decision that it considers justified." Texas Instruments Inc. v. Cypress Semiconductor Corp., 90 F.3d 1558, 1569 (Fed. Cir. 1996). Therefore, while not binding, the court will take the ALJ's Final Initial Determination into consideration.

42. In a detailed and thorough analysis, the ALJ in the 1438 Investigation assessed nearly the same claims of unclean hands raised by Voltage in this case. To be sure, certain additional information was available at the bench trial in this case than was presented to the ALJ. That information includes the emails exchanged between Eric Maschoff and Paul Johnson in October 2023; Paul Johnson's notes from his February 21, 2024 conversation with Eric

Maschoff; Eric Maschoff's emails to Paul Johnson analyzing the allowed claims in the '375 and '376 patents in December 2024; and Eric Maschoff's trial testimony.[15]

43. In a comprehensive 44-page analysis, the ALJ found that Voltage did not establish that Eric Maschoff's communications with Paul Johnson after the entry of the Prosecution Bar Stipulation amounted to unclean hands.

44. The ALJ first agreed with Shoals that Eric Maschoff handed off prosecution of the 18/341,655 application in September 2023, before the Prosecution Bar Stipulation was entered. See In the Matter of CERTAIN PHOTOVOLTAIC TRUNK BUS ASSEMBLIES AND COMPONENTS THEREOF, Investigation No. 337-TA-1438 (Final Initial Determination) (Feb. 6, 2026) (PUBLIC VERSION), at 154-56. The ALJ also concluded that "the evidence does not support that Maschoff Brennan negligently implemented the stipulation." Id. at 159.

45. The ALJ concluded that "[t]o be crystal clear, Mr. Maschoff should not have had *any* communications with Mr. Johnson touching on ongoing prosecution after entry of the stipulation," id. at 160 n.37, but lacking information as to the substance of the October 18-19 emails, concluded that "the October 18-19, 2023, emails are, at most, a technical violation of the stipulation." Id. at 160.

---

[15] On May 1, 2026, the ITC issued a Notice of Commission Determination To Review in Part a Final Initial Determination Finding a Violation of Section 337. In the Matter of CERTAIN PHOTOVOLTAIC TRUNK BUS ASSEMBLIES AND COMPONENTS THEREOF, Investigation No. 337-TA-1438 (Notice)(May 1, 2026). In this Notice, the ITC stated that it had determined not to review the ALJ's Final Initial Determination on the issue of unclean hands. In addition, Voltage had sought to reopen the record on the issue of unclean hands based on certain documents obtained in discovery in this case. The ITC declined to reopen discovery, finding that Voltage "was aware of the existence of the subject documents before the evidentiary record closed in this investigation . . . and offers no compelling excuse for its decision not to pursue these documents during discovery before the ALJ. In addition, the Commission finds that these documents are cumulative of the evidence already of record and Voltage fails to adequately explain how these documents would affect the FID's finding that the Asserted Patents have not been shown to be unenforceable for unclean hands." Id. at 3.

46.     Nor did the ALJ find fault with Paul Johnson's October 26, 2023, "internal discussions of the status of ITC case," id. at 160 (quoting Paul Johnson billing records, DTX-164) with Eric Maschoff, Jessica Garcia, or both, concluding that it "did not relate to prosecution strategy." Id. at 161.  Instead, the ALJ surmised, consistent with Paul Johnson's billing entries, that the internal discussions concerned the status of the ITC case. The ALJ found:

> The record supports that in relation to this time entry, Mr. Johnson was provided with documents from the 1365 investigation, including Voltage's response to the amended complaint and joint claim construction chart. These documents were filed publicly. The evidence supports that Mr. Johnson considered those documents in preparing the November 10 preliminary amendment in the '655 application. . . . In the November 10 preliminary amendment, the pending claims of the '655 application were amended to change the "overmold" and "undermold" terms. . . .

> Voltage's response to the amended complaint demonstrates that the "undermold" and "overmold" terms in the '655 application were being disputed in the 1365 investigation.  The parties' joint claim construction chart shows the same thing. In fact, the joint claim construction chart shows that both Voltage and the Staff contended that an overmold-related term was indefinite and that the terms undermold and primary mold required an overmold. The evidence here—Voltage's response to the amended complaint and the joint claim construction chart, and Mr. Johnson's testimony—support that those documents formed the basis for the claim amendments in the November 10 preliminary amendment. . . .

> The record supports that other than directing Mr. Johnson to publicly available documents to review, Mr. Maschoff was not substantively involved with the prosecution activities leading to the filing of the November 10 preliminary amendment.

Id. at 161, 162, 164, and 167 (internal citations omitted).

47. The ALJ found no evidence to suggest that Paul Johnson's February 14, 2024, response to Office Action in the 18/341,655 application stemmed from a violation of the Prosecution Bar Stipulation, stating:

> There is no record evidence supporting that Mr. Maschoff had any involvement in formulating Shoals's February 14 response to the Office Action in the '655 application or in amending the claims at that time. The only record evidence regarding Mr. Maschoff's alleged involvement in the February 14 claim amendments is that Mr. Johnson did not recall if Mr. Maschoff had any involvement. Mr. Johnson's lack of recollection does not support that Mr. Maschoff was involved. Instead, the evidence supports that the claim amendments in the February 14 response were made in an attempt to overcome the Fujimoto prior art and were consistent with language already in other claims.

Id. at 168-69 (internal citations omitted).

48. Even though the ALJ did not have Paul Johnson's February 21, 2024, notes of his conversation with Eric Maschoff, she had the emails from that date, leading her to conclude that the Prosecution Bar Stipulation was violated.

> Mr. Johnson testified that he concluded what claim language to pursue on his own. It is undisputed, however, that Mr. Maschoff, who was subject to the stipulation, discussed and suggested to Mr. Johnson claim language for the '655 application after issuance of the 1365 claim construction order. And the evidence supports that Mr. Johnson adopted Mr. Maschoff's suggestion and changed the claim language "extending partially through" to "extending <u>at least</u> partially through." Indeed, that was the only change to existing claims 1-21 between the February 14 response to the Office Action and the February 22 supplemental response. The evidence supports that the communications with Mr. Maschoff leading to the February 22 supplemental amendment in the '655 application violated the prosecution bar stipulation.

Id. at 170-71 (internal citations omitted).

49. The ALJ did not find any violation of the Prosecution Bar Stipulation associated with Paul Johnson's subsequent February 28, 2024, counterproposals to the Patent Examiner. The ALJ reasoned that "the claims were already consistent with Mr. Johnson's counterproposal, supporting that no confidential information was needed by Mr. Johnson to make the amendments. The record supports that Mr. Johnson reviewed and relied on Voltage's public response to the 1365 amended complaint, which provided information about the internal structure of Voltage's product," id. at 175, including a schematic diagram from a Voltage patent and an x-ray image of a joint of a Voltage LYNX trunk bus. The ALJ concluded that "[t]he evidence does not support that Mr. Johnson was provided with Voltage confidential information to make his counterproposals or that he communicated with Mr. Maschoff about them. The evidence does not support a violation of the prosecution bar stipulation with respect to Mr. Johnson's counterproposals." Id. at 177.

50. Nor did the ALJ find that "the decision to file the '464 application, which issued as the '376 patent, and to enter the application into Track One (meaning that it received expedited review by the USPTO) violated the prosecution bar stipulation." Id.

> The lack of evidence does not support that the decision to file, the decision to designate as Track One, or what subject matter to pursue in the '464 application were directed by Mr. Maschoff. The record does not support a violation of the prosecution bar stipulation based on the decision to file the '464 application as Track One.

Id. at 178.

51. The ALJ summed up the evidence by concluding:

> The record supports that Mr. Maschoff violated the prosecution bar stipulation in communications with Mr. Johnson and in particular with respect to their communications after the 1365

claim construction order issued and the amendment of the '655 application claim 1 to recite "one or more drop line pathways that each extend <u>at least</u> partially through the monolithic mold" and claim 17 to recite "two drop line pathways that are each configured to allow the two drop lines to extend <u>at least</u> partially through the primary mold"). The question now is whether that violation supports a finding of unclean hands. I conclude that it does not.

<u>Id.</u> at 181 (internal citations omitted).

52. Contrasting the evidence presented by Voltage with that facing the Federal Circuit in <u>Gilead</u>, the ALJ stated:

> Voltage contends that "Shoals' conduct is comparable to the misconduct" in <u>Gilead</u>. I disagree. In <u>Gilead</u>, the Federal Circuit affirmed a holding of unclean hands based "only on the totality of the evidence-supported misconduct" it summarized, "not the individual elements alone and not every finding of the district court." 888 F. 3d at 1240. The totality of misconduct included "pre-litigation business misconduct attributable to Merck," <u>id.</u>, and litigation misconduct, also attributable to Merck. <u>Id.</u> at 1244. Under <u>Gilead</u>, litigation misconduct is not a prerequisite to a finding of unclean hands, but it is at least notable that the Federal Circuit explicitly stated that its affirmance was based on a totality of misconduct, which included litigation misconduct. Voltage does not allege litigation misconduct by Shoals.
>
> More significantly, the pre-litigation misconduct in <u>Gilead</u> is not comparable to the misconduct here. . . .
>
> Here, there is no dispute that prosecution responsibility was transferred to Mr. Johnson before entry of the prosecution bar stipulation. Later, Mr. Maschoff told Mr. Johnson to change the "extending partially through" claim language to "extending at least partially through." Mr. Maschoff made this suggestion based on a publicly available claim construction order, not confidential information such as that obtained from Pharmasett by Dr. Durette in <u>Gilead</u>. And in making this suggestion, Mr. Maschoff stated that the "[t]he second and third apertures merely extend through the mold so as to accommodate a corresponding drop line and facilitate electrical connection at a nexus with the feeder cable," based not on Voltage's confidential information, but

62

instead on (a) embodiments already disclosed and claimed in Shoals's patents, and (b) the internal structure of Voltage's device, as publicly disclosed in Voltage's response to the 1365 amended complaint. . . .

At bottom, amending '655 application claims 1 and 17 to recite "at least partially" instead of only "partially" after issuance of the public claim construction order is in a different league entirely from canceling genus claims to cover a species only known through violation of a firewall agreement, as in Gilead. While the communications between Mr. Maschoff and Mr. Johnson should never have taken place because of the prosecution bar stipulation, I credit Mr. Johnson's testimony that review of the claim construction order and awareness of what was disclosed in the specification and the internal structure of Voltage's products, made publicly available by Voltage, would have led someone to the same amendments without having the prohibited communications with Mr. Maschoff. As a result, the record does not support that the communications between Mr. Maschoff and Mr. Johnson relating to the claim construction order have an "immediate and necessary relation to the equity that [Shoals] seeks in respect to the matter in litigation." Gilead, 888 F.3d at 1239, quoting Keystone Driller Co. v. General Excavator Co., 290 U.S. 240 (1933).

Id. at 183, 184-85, 188-89 (internal record citations omitted).

53. The ALJ also contrasted the evidence in this case from the facts present in Precision Instrument, Keystone Driller, and Hazel-Atlas, finding that the misconduct in those cases is not analogous to that here. Id. at 190-91.

54. Finally, citing the district court decision in Eolas Tech. for the proposition that the violation of a prosecution bar stipulation in that case did not amount to unclean hands because "it had no impact," id. at 192 (quoting Eolas Tech., No. 17-cv-03022-JST, at *7), the ALJ concluded that "because the evidence demonstrates that review of the public 1365 claim construction order would have led to the 'at least' claim amendments irrespective of Mr.

63

Maschoff's communications with Mr. Johnson, there is not clear and convincing evidence of unclean hands." Id. at 192.

55.    Considering a subset of the evidence presented to the court at the bench trial, the ALJ reached the same conclusions of law that the court does here, i.e., that while the Prosecution Bar Stipulation was violated by Eric Maschoff's suggestions to Paul Johnson on February 21, 2024, that violation is insufficient to establish unclean hands rendering the patents in suit unenforceable.

56.    While the court agrees with the ALJ that the evidence in this case does not support a finding of unclean hands sufficient to render the '375, '376 and '295 patents unenforceable, the ALJ was not faced with the issue of the impact of the acceleration of the patent prosecution occasioned by Eric Maschoff's February 21, 2024, communications on the damages potentially available in this case.

57.    In short, while equity does not require that the '375, '376, and '295 patents be declared unenforceable, the undisputed acceleration in the patent prosecution stemming from Eric Maschoff's February 21, 2024, communications requires that the court tailor any damages award in this case to account for that acceleration.

Accordingly, the court concludes that the evidence does not support a finding of inequitable conduct or unclean hands sufficient to render the '375, '376, and '295 patents unenforceable. Voltage's affirmative defenses of inequitable conduct and unclean hands seeking the remedy of unenforceability are **OVERRULED**. As noted, at the same time, the court **TAKES UNDER ADVISEMENT** until trial the impact of the acceleration of the

64

prosecution of Shoals's patents resulting from the February 21, 2024, violation of the Prosecution Bar Stipulation on any damages which may be awarded in this case.

An appropriate order will be entered.

Entered: June 5, 2026


Michael F. Urbanski
Senior United States District Judge

Case 1:25-cv-00026-MFU-JGM    Document 548    Filed 06/05/26    Page 65 of 65